

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-14-00606-CV

**ARGO GROUP US, INC.**, Colony Management Services, Inc., Colony Insurance Company, Colony National Insurance Company, Colony Specialty Insurance Company, Colony Agency Services, Inc., and Argo Group International Holdings, Ltd.,
Appellants

v.

Louis D. **LEVINSON**, International Financial Group, Inc., Guilford Specialty Group, Inc., Guilford Insurance Company, and The Burlington Insurance Company,
Appellees

From the 224th Judicial District Court, Bexar County, Texas
Trial Court No. 2014-CI-09550
Honorable Antonia Arteaga, Judge Presiding

## OPINION ON REHEARING

Opinion by:    Sandee Bryan Marion, Chief Justice

Sitting:       Sandee Bryan Marion, Chief Justice
               Karen Angelini, Justice
               Patricia O. Alvarez, Justice

Delivered and Filed:  June 10, 2015

AFFIRMED

This is an appeal from the trial court's denial of appellants' request for a temporary injunction. On January 14, 2015, we dismissed the appeal as moot. Appellants filed a motion for rehearing. In an order dated April 27, 2015, this court granted the motion for rehearing, withdrew our opinion and judgment of January 14, 2015, and submitted the appeal for oral arguments. After

considering the merits of the appeal, we cannot conclude the trial court abused its discretion; therefore, we affirm.

## BACKGROUND

Argo Group US, Inc. and other entities wholly-owned by Argo Group US, Inc. (collectively, "Argo") are in the business of underwriting excess and surplus lines insurance, as well as other types of insurance. Argo employed Louis Levinson as president of Argo's excess and surplus division. Levinson's employment agreement with Argo contained a restrictive covenant that prohibited him from being employed, engaged, or otherwise interested in the business of a competing insurance company for one year after leaving Argo. Levinson resigned from Argo effective August 25, 2013.

The day after Levinson left Argo, International Financial Group, Inc. ("IFG"), which competes with Argo in the excess and surplus market, issued a press release stating Levinson agreed to become president of an IFG affiliate upon expiration of Levinson's noncompetition period. On June 16, 2014, Argo sued Levinson and others asserting Levinson violated the restrictive covenant, raising several causes of action, and requesting temporary and permanent injunctive relief. Following a hearing on Argo's request for a temporary injunction, the trial court denied the request for injunctive relief on August 18, 2014. The one-year restriction contained in the covenant not to compete expired on August 25, 2014, the same day appellants filed their notice of appeal in this court.

In a single issue on appeal, Argo asserts the trial court erred in denying its request for a temporary injunction.

## STANDARD OF REVIEW

In this interlocutory appeal, our review is limited to determining whether the trial court abused its discretion in denying Argo's request for a temporary injunction. *Davis v. Huey*, 571

S.W.2d 859, 861-62 (Tex. 1978). The merits of the underlying litigation are not presented for our review. *Id.* at 861. A clear abuse of discretion occurs when the trial court's decision is so arbitrary and capricious that it amounts to clear error. *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992) (orig. proceeding). Because a trial court has no discretion in determining what the law is or applying the law to the facts of the case, the failure to analyze or apply the law correctly constitutes an abuse of discretion. *Id.* at 840.

When reviewing the evidence in the context of an abuse-of-discretion standard, we engage in a two-pronged inquiry: (1) whether the trial court had sufficient information on which to exercise its discretion; and if so, (2) whether the trial court erred in the application of discretion; that is, whether based on the evidence, the trial court made a decision that was neither arbitrary nor unreasonable. *In re Rogers*, 370 S.W.3d 443, 445 (Tex. App.—Austin 2012, orig. proceeding); *see Zeifman v. Michels*, 212 S.W.3d 582, 588 (Tex. App.—Austin 2006, pet. denied).

With regard to factual matters, an abuse of discretion occurs if the record establishes that the "trial court could reasonably have reached only one decision." *Walker*, 827 S.W.2d at 840. We review the evidence in the light most favorable to the trial court's order and indulge all reasonable inferences in favor of the decision. *Center for Econ. Justice v. American Ins. Ass'n*, 39 S.W.3d 337, 344 (Tex. App.—Austin 2001, no pet.). When, as here, the trial court does not file findings of fact or conclusions of law, we will uphold the order on any legal theory supported by the record. *Universal Health Servs., Inc. v. Thompson*, 24 S.W.3d 570, 577 (Tex. App.—Austin 2000, no pet.).

**ANALYSIS**

Ordinarily, to obtain a temporary injunction, a plaintiff must plead and prove (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198,

204 (Tex. 2002). On appeal, Argo asserts it was not required to show irreparable injury because it showed a violation of a statute that authorizes injunctive relief.

Argo sued pursuant to Texas Business and Commerce Code section 15.51, which provides that "a court may award the promisee under a covenant not to compete damages, injunctive relief, or both damages and injunctive relief for a breach by the promisor of the covenant." TEX. BUS. & COM. CODE ANN. § 15.51(a) (West 2011). The criteria for enforcing a covenant not to compete are contained in section 15.50:

> Notwithstanding Section 15.05 of this code, and subject to any applicable provision of Subsection (b), a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

*Id.* § 15.50(a).

The criteria for enforceability of a covenant not to compete provided by section 15.50 "and the procedures and remedies in an action to enforce a covenant not to compete provided by Section 15.51 of this code are exclusive and preempt any other criteria for enforceability of a covenant not to compete or procedures and remedies in an action to enforce a covenant not to compete under common law or otherwise." *Id.* § 15.52.

Based on the preemption language contained in section 15.52, Argo asserts that to obtain a temporary injunction it was only required to establish the criteria set forth in section 15.50(a), which does not include a showing of irreparable harm. Argo relies on three opinions from the Dallas Court of Appeals to support its argument that section 15.52 applies to both temporary and permanent injunctions. *See McNeilus Cos. Inc. v. Sams*, 971 S.W.2d 507 (Tex. App.—Dallas 1997, no pet.); *Hilb, Rogal & Hamilton Co. of Tex. v. Wurzman*, 861 S.W.2d 30 (Tex. App.—

Dallas 1993, no writ); *Recon Exploration, Inc. v. Hodges*, 798 S.W.2d 848 (Tex. App.—Dallas 1990, no writ).

However, in 2012, the Dallas Court of Appeals noted that although these cases "do contain dicta suggesting the Act's enforceability requirements supercede those under the common law for injunctive relief, we have never held the Act eliminates the requirement that an applicant show irreparable harm to obtain a temporary injunction based on a covenant not to compete." *Primary Health Physicians, P.A. v. Sarver*, 390 S.W.3d 662, 664-65 (Tex. App.—Dallas 2012, no pet.). The *Sarver* court then joined its sister courts in holding that "the Act does not preempt the requirements for obtaining temporary injunctive relief." *Id.* at 665 (citing *EMSL Analytical, Inc. v. Younker*, 154 S.W.3d 693, 695 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 239-40 (Tex. App.—Houston [1st Dist.] 2003, no pet.); *NMTC Corp. v. Conarroe*, 99 S.W.3d 865, 867-68 (Tex. App.—Beaumont 2003, no pet.)). The *Sarver* court agreed "with the reasoning of these cases that the Act governs only final remedies and does not supplant the common law requirements for a pretrial temporary injunction." *Id.* Since *Sarver* issued in 2012, other Texas courts of appeals have agreed that evidence of a probable, imminent, and irreparable injury in the interim is a necessary element for a temporary injunction. *See Tranter, Inc. v. Liss*, No. 02-13-00167-CV, 2014 WL 1257278, at *7 (Tex. App.—Fort Worth Mar. 27, 2014, no pet.) (mem. op.) (section 15.52 does not apply to temporary injunctions); *Down Time-South Texas, LLC v. Elps*, 13-13-00495-CV, 2014 WL 1464320, at *7 (Tex. App.—Corpus Christi-Edinburg Mar. 20, 2014, no pet.) (mem. op.) (requiring proof of injury). We join these courts and hold that a plaintiff seeking a temporary injunction under section 15.51 must show a probable, imminent, and irreparable injury in the interim before trial. Therefore, we next turn to an examination of the evidence in support of the

trial court's order, specifically whether Argo showed a probable, imminent, and irreparable injury in the interim before trial.

Argo points to a covenant contained in Levinson's Executive Employment Agreement, which states Argo has

> [t]he right and remedy to have such provisions [of the Agreement] specifically enforced by any court having equitable jurisdiction. The Employee specifically acknowledges and agrees that any breach or threatened breach of the provisions of Sections 8 or 9 hereof may cause irreparable injury to the Company and that money damages will not provide an adequate remedy to the Company.

Section 8 of the Agreement concerns the use of confidential information, and Section 9 contains the restrictive covenant not to compete.

Argo relies on *Wright v. Sport Supply Group, Inc.*, 137 S.W.3d 289 (Tex. App.—Beaumont 2004, no pet.), to argue the above covenant is unrebutted evidence of irreparable harm. In *Wright*, the court addressed an agreement that contained a provision that remedies at law for any breach or attempted breach of the agreement would be inadequate and waived as a defense that either party had an adequate remedy at law. *Id.* at 293-94. The court noted it was "unaware of any Texas case holding that such agreements alone establish, for injunction purposes, that remedies at law will be inadequate, [but] the Texas Supreme Court long has recognized 'a strong public policy in favor of preserving the freedom of contract.'" *Id.* at 294 (quoting *Lawrence v. CDB Serv., Inc.*, 44 S.W.3d 544, 553 (Tex. 2001)). The court considered the language of the agreement together with other evidence established by the record, including testimony that the plaintiff's damages would have been difficult to calculate. *Id.* at 293-94. The court concluded, after viewing the evidence in the light most favorable to the trial court's grant of the temporary injunction, that the trial court did not abuse its discretion in determining the plaintiff had no adequate remedy at law. *See id.* at 294.

We first note that *Wright* involved an appeal from the granting of a temporary injunction, whereas here, we must view the evidence in the light most favorable to the trial court's denial of

the temporary injunction. Although the language in the agreement in this case may be some evidence that Levinson's violation of the noncompete clause "may cause irreparable injury," we must review the entire record, and we must do so in the light most favorable to the trial court's order denying the temporary injunction.

On appeal, Argo relies on the testimony of two witnesses to establish a probable, imminent, and irreparable injury before trial. Arthur Davis, Argo's current President of Excess and Surplus lines business, named several key Argo employees who left to work for IFG. When asked whether he "observed any harm . . . that has occurred to Argo's E&S division" since Levinson left, Davis answered "absolutely." When asked to describe the harm he observed, Davis replied as follows:

> I think the - - the immediate harm is the departure of the employees themselves. These are talented, experienced people, which are difficult to acquire, who have a lot of industry and institutional knowledge that - - that they left - - that they took with them.
>
> Reputationally, it creates some dissidence in the entire marketplace when a large number of people leave an individual market. And in that marketplace, I would say our retailers become concerned, retailers become concerned about placing business with us. Ultimately, policyholders become concerned, and our reinsurers are concerned. They're all concerned because there's a talent drain that happens.
>
> . . .
>
> When asked if business had been lost, Davis replied, "yes." On voir dire, Davis was asked

the following:

> Q. Mr. Davis, name one customer that Argo has lost as a result of the so-called dissidence in the market?
> A. I think by customer I'm referring to policyholders and we have significantly less business now than we did before they left.
> . . .
> [The trial court asked:] Do you know the name of any policyholders?
> A. I do not.

The trial court asked Davis to list the harms he observed so that the attorneys could then "delve into" them. Davis responded: loss of people, reputation, and confidential information;

concern and anxiety among Argo employees; and loss of business and potential loss of business. As to the loss of key employees, Davis said five senior managers left to work for IFG within the last twelve months, all during Levinson's noncompete period. The loss of the employees caused harm to Argo's reputation; a loss of experience, talent and institutional knowledge; a potential loss of confidential information; and loss of revenue, with premiums in the property department dropping by twenty to thirty percent. However, Davis admitted he did not know definitively whether the drop in revenue was due to the loss of a key employee. Davis said Argo has been unable to replace some of the employees, despite working with recruiters. He said this has caused the company to be more "inwardly focused," instead of interacting with clients. In terms of Argo's reputation, Davis stated customers, both wholesalers and reinsurance intermediaries, have become "alarmed at the significant number of departures wondering if there's something underlying and causing these things to happen." Davis testified the employee departures caused dissidence in the market because doubts about a company's continued stability can result when large numbers of people leave an organization. Davis did not know whether any of the employees that left Argo had noncompete agreements with Argo, with the exception of one employee who had only a six-month noncompete agreement.

Regarding the harm from loss of confidential information, Davis admitted he was not aware of any specific confidential Argo information being provided to IFG. However, he testified that some of the employees who left and were now working for IFG had access to "the highest levels of confidential information, to the highest levels of a [sic] strategic plans and initiatives." Davis said that because IFG is a competitor "transferring our confidential information into theirs would appear to be relatively straightforward." Davis characterized the type of confidential information as the type of business Argo tries to attract or not attract, how it prices its business, and how it uses reinsurance relationships to mitigate potential losses.

As evidence of Levinson using Argo's confidential information in presentations with third parties in the past, Argo presented the testimony of Oleg Ilichev, the chief financial officer of Argo's US Operations. Ilichev said that, in the fall of 2012, he attended a meeting with Levinson and a partner with the investment firm, Pine Brook Partners. The purpose of the meeting was to discuss a possible partnership with Pine Brook to start or acquire an insurance company. At the meeting, Levinson made a presentation to Pine Brook that included information about Argo's E&S business. A chart prepared as part of the presentation showed various Argo employees—by their titles and not their names—to whom Levinson would look for the purpose of starting a new venture. Ilichev testified a similar meeting was held in May 2013 with another investment company named Crestview Partners.

Levinson admitted he was provided with confidential information while employed by Argo. He also admitted he understood he was prohibited from providing any services to IFG that were of the same or similar type that he provided to Argo for a period of one year after leaving Argo's employment. He acknowledged that Argo would pay him $400,000 in exchange for his concessions under the agreement. Levinson denied he participated in hiring decisions at IFG after he left Argo or in preparing for the operation of IFG once he began his employment with IFG. Brett Reynolds, President of David Brooke Executive Search Firm, testified that in late 2013, Bob Linton, Chairman of IFG, retained him to recruit people to fill certain positions at IFG. He said he was first asked to call "someone at IFG property and communicate the fact that [Michael] Denton had [left Argo and] gone to IFG." He testified he spoke to Greg Roblek, Dennis Doyle, and Tom Poland—all Argo employees—about an opportunity for a senior position in the property business of an unidentified company. He stated IFG did not tell him to call Roblek or Doyle. Linton later hired all three men to work for IFG. Reynolds said he was aware that Janice Coe, who had never been an Argo employee, had met with Levinson before she accepted a position with

IFG, but he did not set up her interview with Linton. Reynolds stated his only contact with Levinson was a brief exchange as he was leaving Linton's apartment and Levinson was entering the apartment with several other IFG employees. Reynolds denied he sent Levinson to Linton's apartment.

Argo also asserts an employee's breach of a noncompetition covenant creates a rebuttable presumption that the plaintiff will suffer irreparable injury. Proof of a continued breach of a noncompetition agreement by a highly trained employee constitutes prima facia evidence of probable injury. *Martin v. Linen Sys. for Hosp., Inc.*, 671 S.W.2d 706, 709 (Tex. App.—Houston [1st Dist.] 1984, no writ); *Hartwell's Office World, Inc. v. Systex Corp.*, 598 S.W.2d 636, 639 (Tex. Civ. App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.); *Beasley v. Hub City Tex., L.P.*, No. 01-03-00287-CV, 2003 WL 22254692, at *7-8 (Tex. App.—Houston [1st Dist.] Sept. 29, 2003, no pet.) (mem. op.). Here, the trial court was aware that, at the time of the hearing, which ended on August 18, 2014, the covenant not to compete would expire on August 25, 2014. Thus, the trial court was entitled to draw a reasonable inference that any alleged "breach of a noncompetition agreement by a highly trained employee" would continue for only another seven days. Nevertheless, at the hearing and on appeal, Argo asserts the trial court should have granted an equitable extension of the covenant not to compete.

Even if Texas law allows a court to equitably extend the time period of a covenant not to compete, the plaintiff must still establish the elements necessary to obtain the temporary injunction. We believe the entirety of the evidence, viewed in a light most favorable to the trial court's order, supports the trial court's denial of Argo's request for a temporary injunction based on Argo's failure to establish a probable, imminent, and irreparable injury before trial.

## CONCLUSION

When reviewing a trial court's ruling for an abuse of discretion, we may not substitute the trial court's judgment for our own. *Schlager v. Clements*, 939 S.W.2d 183, 191 (Tex. App.—Houston [14th Dist.] 1996, writ denied). We are limited to determining whether the trial court abused its discretion by acting arbitrarily and unreasonably, without reference to guiding rules or principles, or misapplying the law to the established facts of the case. *Id.* In this case, we must conclude the trial court did not abuse its discretion in denying Argo's request for a temporary injunction. Accordingly, we affirm the trial court's denial of the request for a temporary injunction.[1]

Sandee Bryan Marion, Chief Justice

---

[1] The merits of appellants' underlying causes of action remain pending.