ACCEPTED
15-25-00001-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
3/3/2025 10:43 PM
CHRISTOPHER A. PRINE
CLERK

**Case No. 15-25-00001-CV**

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
3/3/2025 10:43:19 PM
CHRISTOPHER A. PRINE
Clerk

# COURT OF APPEALS
# FOR THE
# FIFTEENTH DISTRICT OF TEXAS – AUSTIN

## CREATEAI HOLDINGS INC.,

**Appellant,**

**v.**

## BOT AUTO TX INC.,

**Appellee.**

**On Appeal from the 11th Judicial District of the Business Court
of Harris County, Texas
Honorable Sofia Adrogué, President Judge**

## BRIEF OF APPELLANT
*Oral Argument Requested*

**Timothy J. McCarthy**
State Bar No. 24123750
tmccarthy@dykema.com
**Cliff P. Riley**
State Bar No. 24094915
criley@dykema.com
**Salvador J. Robles**
State Bar No. 24121800
srobles@dykema.com
**Aaron J. Kotulek**
State Bar No. 24137483
akotulek@dykema.com
DYKEMA GOSSETT PLLC

**Isaac Villarreal**
State Bar No. 24054553
ivillareal@dykema.com
**Amanda Gordon**
State Bar No. 24103737
agordon@dykema.com
DYKEMA GOSSETT PLLC
5 Houston Center
1401 McKinney St., Suite 1625
Houston, Texas 77010
Telephone: (713) 904-6900
Facsimile: (214) 462-6401

1717 Main Street, Suite 4200
Dallas, Texas 75201
Telephone: (214) 462-6400
Facsimile: (214) 462-6401

| | |
|---|---|
| **Appellant:** | **CreateAI Holdings, Inc. (formerly known as TuSimple Holdings, Inc.)** |
| **Trial & Appellate Counsel:** | **Timothy J. McCarthy** <br> State Bar No. 24123750 <br> tmccarthy@dykema.com <br> **Cliff P. Riley** <br> State Bar No. 24094915 <br> criley@dykema.com <br> **Salvador J. Robles** <br> State Bar No. 24121800 <br> srobles@dykema.com <br> **Aaron J. Kotulek** <br> State Bar No. 24137483 <br> akotulek@dykema.com <br> **DYKEMA GOSSETT PLLC** <br> 1717 Main Street, Suite 4200 <br> Dallas, Texas 75201 <br> 214.462.6400 |
| | **Isaac Villareal** <br> State Bar No. 24054553 <br> ivillareal@dykema.com <br> **Amanda Gordon** <br> State Bar No. 24103737 <br> agordon@dykema.com <br> **DYKEMA GOSSETT PLLC** <br> 5 Houston Center <br> 1401 McKinney St., Suite 1625 <br> Houston, Texas 77010 <br> 713.904.6900 |
| **Appellee:** | **Bot Auto TX, Inc.** |
| **Trial & Appellate Counsel:** | **Joseph A. Fischer, III** <br> tfischer@jw.com <br> Texas Bar No. 00789292 <br> **Tori C. Emery** <br> temery@jw.com <br> Texas Bar No. 24126228 |

**JACKSON WALKER, LLP**
1401 McKinney, Suite 1900
Houston, TX 77010
(713) 752-4530

# STATEMENT OF THE CASE

| | |
|---|---|
| ***Nature of the case:*** | In this trade secrets misappropriation suit, CreateAI Holdings Inc., ("Appellant" or "CreateAI") filed a petition against Appellee Bot Auto TX Inc. ("Bot Auto") for violations of the Texas Uniform Trade Secrets Act and sought a temporary injunction after Appellee, Bot Auto, commenced business operations using confidential, proprietary, and trade secret information that belonged to Appellant. Appellant poured hundreds of millions of dollars into researching and developing technology for an autonomous driving system that would allow for the fully autonomous operation of semi-trucks on open public roads without a human in the vehicle or remote human intervention, i.e. "driver-out" operations. The confidential, proprietary, and trade secret information that Appellee Bot Auto misappropriated included, but is not limited to, Appellant's redundant power and steering systems relating to driver-out operations of commercial vehicles. |
| ***Trial Court:*** | Hon. Sofia Adrogué; in the Business Court Division of the Eleventh District Sitting in Harris County, Texas; Cause No. 24-BC11A-0007 |
| ***Trial Court Disposition:*** | On December 28, 2024, the Court denied Appellant's Application for Temporary Injunction against Bot Auto TX Inc. and dissolved the order granting Appellant's Application for Temporary Restraining Order to Preserve the Status Quo entered on October 28, 2024. |

# TABLE OF CONTENTS

**Page**

IDENTITY OF PARTIES AND COUNSEL ................................................................. iii

STATEMENT OF THE CASE ............................................................................... v

TABLE OF CONTENTS ..................................................................................... vi

TABLE OF AUTHORITIES ................................................................................ viii

STATEMENT REGARDING ORAL ARGUMENT ................................................. x

ISSUES PRESENTED ....................................................................................... xi

STATEMENT OF JURISDICTION ..................................................................... xii

STATEMENT OF PROCEDURAL HISTORY ...................................................... xiii

STATEMENT OF FACTS .................................................................................. 2

    A.    Appellant's Autonomous Trucking Technology Business Relies on its Confidential, Proprietary, and Trade Secret Information ................................................................. 2

    B.    Hou, and Other Former Employees of Appellant Now Employed by Bot Auto, Had Comprehensive Access to Appellant's Confidential, Proprietary, and Trade Secret Information, and Misappropriated It .......................................... 9

SUMMARY OF THE ARGUMENT ..................................................................... 27

STANDARD OF REVIEW ................................................................................. 30

ARGUMENT ................................................................................................... 31

    I.    ARGUMENTS & AUTHORITIES ............................................................... 31

        A.    Pivotal Cases ................................................................. 34

            1.    IAC, Ltd. v. Bell Helicopter Textron, Inc. ..................... 34

            2.    T-N-T Motorsports v. Hennessey Motorsports .............. 36

        B.    The Case at Bar: CreateAI Holdings, Inc. v. Bot Auto TX, Inc. ................................................................. 38

            1.    The trial court erred in denying Appellant's Application for Temporary Injunction because Appellant presented clear evidence that Bot Auto

        misappropriated its trade secrets and thus of a
probable right of relief. .....................................................38

C.    The trial court erred in denying Appellant's Application
for Temporary Injunction because Appellant's evidence
establishes a presumption that it suffered irreparable
injury. ....................................................................................49

CONCLUSION ..........................................................................................51

CERTIFICATION OF COMPLIANCE ....................................................54

CERTIFICATE OF SERVICE .................................................................55

**Page(s)**

**Cases**

*Argo Grp. US, Inc. v. Levinson*,
    468 S.W.3d 698 (Tex. App.—San Antonio 2015, no pet.) ...............................30

*Brooks v. Expo Chem. Co.*,
    576 S.W.2d 369 (Tex. 1979) ...........................................................................30

*Byrd Ranch, Inc. v. Interwest Sav. Assoc.*,
    717 S.W.2d 452 (Tex. App.—Fort Worth 1986, no writ) ..................................49

*Good Shepherd Hosp., Inc. v. Select Specialty Hosp. - Longview, Inc.*,
    563 S.W.3d 923 (Tex. App.—Texarkana 2018, no pet.)...................................31

*IAC, Ltd. v. Bell Helicopter Textron, Inc.*,
    160 S.W.3d 191 (Tex. App.—Fort Worth 2005, no pet.)...........................*passim*

*Keystone Life Ins. Co. v. Mktg. Mgmt., Inc.*,
    687 S.W.2d 89 (Tex. App.—Dallas 1985, no writ)...........................................32

*Manufacturers Hanover Trust Co. v. Kingston Inv. Corp.*,
    819 S.W.2d 607 (Tex. App.—Houston [1st Dist.] 1991, no writ) .....................39

*Martin v. Linen Sys. for Hosp. Inc.*,
    671 S.W.2d 706 (Tex. App.—Houston [1st Dist.] 1984, no writ) .....................49

*Navarro Auto-Park, Inc. v. San Antonio*,
    580 S.W.2d 339 (Tex. 1979) ...........................................................................30

*Rugen v. Interactive Bus. Sys.*,
    864 S.W.2d 548 (Tex. App.—Dallas 1993, no writ)....................................31, 49

*Sun Oil Co. v. Whitaker*,
    424 S.W.2d 216 (Tex. 1968) .......................................................................38, 39

*T-N-T Motorsports v. Hennessey Motorsports*,
    965 S.W.2d 18 (Tex. App.—Houston [1st Dist.] 1998)..............................*passim*

*Williams v. Compressor Eng'g Corp.*,
    704 S.W.2d 469 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.)......49

*Wylie Indep. Sch. Dist. v. TMC Founds., Inc.*,
    770 S.W.2d 19 (Tex. App.—Dallas 1989) ......................................................30

**Statutes**

Tex. Civ. Prac. & Rem. Code § 134A.002(3).........................................................33

Tex. Civ. Prac. & Rem. Code § 134A.002(6).........................................................33

Texas Civil Practice & Remedies Code § 51.014(a)(4) ..........................................27

Texas Civil Practice and Remedies Code Section 65.011, and principles ..............31

Texas Uniform Trade Secrets Act.......................................................................1, 28

TUTSA.............................................................................................29, 32, 33, 48

**Other Authorities**

Texas Rules of Civil Procedure 680-692.................................................................31

## STATEMENT REGARDING ORAL ARGUMENT

This case requires the Court to determine whether Appellant sufficiently established some evidence that Appellee misappropriated Appellant's trade secrets in violation of the Texas Uniform Trade Secrets Act ("TUTSA") and has suffered probable, imminent, and irreparable harm as a result. This case involves complex technology that Appellant originally created for purposes of developing the first autonomous trucking technology to achieve fully autonomous operation of a semi-truck on open public roads without a human in the vehicle or remote human intervention, and an open question of law under TUTSA. Thus, Appellant believes oral argument would aid the Court in resolving these issues.

# ISSUES PRESENTED

In this trade secrets misappropriation suit, Appellant sought a temporary and permanent injunction against Appellee, but the trial court denied Appellant's application for temporary injunction and dissolved the temporary restraining order previously entered by the court.

*Issue 1.*      Whether the trial court erred in denying Appellant's Application for Temporary Injunction when Appellant presented more than "some evidence" of misappropriation of trade secret information, and thus a probable right of relief upon a claim for violation of the Texas Uniform Trade Secrets Act.

*Issue 2.*      Whether the trial court erred in denying Appellant's Application for Temporary Injunction because Appellant's showing established a presumption of probable, imminent, and irreparable harm as a matter of law.

## STATEMENT OF JURISDICTION

The Fifteenth Court of Appeals has jurisdiction over this case pursuant to Texas Civil Practice & Remedies Code § 15.014(a)(4) because the 11th Judicial District of the Business Court of Harris County, Texas denied Appellant's Application for Temporary and Permanent Injunction on December 28, 2024, and Appellant filed a timely notice of interlocutory appeal on December 31, 2024.

## STATEMENT OF PROCEDURAL HISTORY

This Appeal arises out of a trade secret dispute, involving the misappropriation by Appellee, Bot Auto TX Inc. ("Bot Auto"), of trade secrets belonging to Appellant, CreateAI Holdings Inc. (formerly known as TuSimple Holdings Inc.) ("Appellant"). On October 1, 2024, seeking to protect its goodwill and trade secrets, Appellant submitted its Original Petition and Application for Temporary Injunction. CR0006-0039.

On October 2, 2024, Bot Auto agreed to the entry of a Stipulation and Order, prohibiting Bot Auto from transferring or disseminating Appellant's technology. CR0173-0176.

On October 28, 2024, Bot Auto agreed to extend the duration of the Stipulation and Order. CR0858-0862.

Despite this, upon hearing but without making any findings of fact, on December 28, 2024, the trial court denied Appellant's Application for Temporary and Permanent Injunctions. CR1091-1093.

Accordingly, on December 30, 2024, Appellant submitted its Request for Findings of Fact and Conclusion of Law regarding the trial court's Order. CR1094-1098. Desiring to prevent the imminent misappropriation of its trade secrets, Appellant submitted its Notice of Accelerated Appeal on December 31, 2024.

CR1151-1154. To date, the trial court has not issued any findings of fact or conclusions of law pursuant to Appellant's request.

TO THE HONORABLE JUSTICES OF THE COURT:

Appellant CreateAI Holdings Inc. files this interlocutory appeal following the trial court's denial of Appellant's Application for Temporary Injunction. This case stems from Appellee Bot Auto TX Inc.'s ("Bot Auto") brazen theft of Appellant's advanced self-driving technology, which Bot Auto misappropriated from Appellant when its founder, Xiaodi Hou, who was Appellant's former Chief Technology Officer ("CTO"), Chief Executive Officer ("CEO"), and member of its Board of Directors, was terminated as CTO and CEO of Appellant and ultimately resigned from Appellant's Board of Directors, and started Bot Auto using the same technology developed by Appellant. Appellant filed suit against Bot Auto for violating the Texas Uniform Trade Secrets Act ("TUTSA") and sought a temporary injunction merely restraining Bot Auto from further disseminating the trade secrets that it had misappropriated from Appellant. Despite an abundance of evidence to support Appellant's request for a temporary injunction, the trial court denied Appellant's application. Appellant, now, respectfully requests that this Court reverse the trial court's decision and remand with instructions to the trial court to enter the requested temporary injunction for the reasons set forth below.

1

## STATEMENT OF FACTS

### A.   Appellant's Autonomous Trucking Technology Business Relies on its Confidential, Proprietary, and Trade Secret Information.

In 2015, Xiaodi Hou co-founded TuSimple Holdings, Inc., now known as CreateAI Holdings Inc., the Appellant in this matter. Appellant develops and markets autonomous trucking technology, in the United States and internationally. CR0010 and CR0016.

Over the course of many years and upon the investment of hundreds of millions of dollars, Appellant developed substantial confidential, proprietary, and trade secret information. CR0010.

Through its efforts, Appellant became a leader in the autonomous driving sector. CR0010. Appellant previously partnered with UPS, Navistar, Penske Truck Leasing, and McLane (the grocery and food service supply chain holding of Berkshire Hathaway), and worked with overseas customers and co-developers in Sweden, Japan and China. CR0010-0011.

Appellant is the first company focused on autonomous trucking technology to achieve fully autonomous operation of a semi-truck on open public roads without a human in the vehicle or remote human intervention—i.e. "driver-out" operation. CR0011. This achievement was the result of Appellant researching and developing its technology over the course of seven years and investing hundreds of millions of U.S. dollars. CR0011.

Appellant's autonomous trucking technology is highly complex, and consists of numerous different systems and technologies working together to allow an equipped truck to travel safely and reliably to its destination. Among these individual proprietary technologies are three that are key to the success of Appellant's overall autonomous trucking technology:

a. Appellant has developed proprietary sensor suite technology and a custom perception housing (the "Sensor Suite Technology") that enables a truck to "see" its surroundings in real time, and to detect other vehicles, pedestrians, road conditions, hazards, and numerous other external and environmental factors, thereby allowing the vehicle to travel safely and reliably to a given destination.

b. Appellant has developed proprietary autonomous decision-making technology (the "Autonomous Decision-Making Technology") that includes and incorporates know-how regarding the real-word situations and conditions that a truck will encounter on the road, including "edge cases" – that is, unusual but hazardous situations, such as unexpected obstacles, emergency vehicles, and unsafe driving by other vehicles – that are rare but are also critical to the ability of an autonomous vehicle to operate safely.

c. Appellant has developed proprietary safety technology (the "Automatic Safety Technology") that includes certain redundant systems and subsystems that provide "fail-safe" and "fail-operational" capabilities of the self-driving vehicles equipped with its technology, and ensure that in the event of an unexpected loss of power or other malfunction in a critical system, the self-driving truck will be able to bring itself to a safe stop and call for assistance, and thus to ensure safe operation on the public roads.

CR0007

"Driver-out" capability is the ability of the truck to drive from a terminal (for instance, a warehouse or a parking lot) to another terminal without a human driver

3

or safety operator. CR0011. This requires the vehicle itself to deal with all of the driving challenges associated with driving at full speed on a highway, and it requires the vehicle to have proper "fail-safe" and "fail-operational" systems built in. CR0011. A "fail-safe" vehicle is one that automatically responds to a fault in the system (such as a failure of sensors or software, or a mechanical issue) by bringing itself safely to a stop without being a hazard to other vehicles on the road. CR0011. A "fail-operational" vehicle is one that can continue to perform sufficiently, even in the event of a system fault, to slowly come to stop and thus prevent accidents on the road. CR0011.

To achieve safe "driver-out" road operations, Appellant developed a market-leading autonomous driving system, consisting *inter alia* of its proprietary sensor suite and housing; a proprietary centralized onboard computer running a wide array of artificial intelligence models in real time and incorporating Appellant's know-how regarding road conditions and edge cases; and proprietary designs of redundant power and steering systems to ensure safety in driving operations. CR0012.

The Sensor Suite Technology enables the autonomous driving system to identify and track objects around the truck (including coverage of what would otherwise be blind spots), and operate safely on the road even without a human driver. CR0012. It incorporates numerous trade secrets, including those directed to the following: The design of the suite of sensors, including the design of

4

redundancies in the sensor suite; the specifications of those sensors; certain non-public aspects of the arrangement and alignment of the sensors; the manner in which the information from those sensors is "fused," within an Appellant-designed computer unit; and certain non-public aspects of the design of the physical perception housing for the sensors and the manner in which the housing is designed to protect such sensors from certain environmental conditions. CR0012. Certain specific details and implementations of these aspects of the Sensor Suite Technology constitute highly valuable trade secrets of Appellant (the "Sensor Suite Technology Trade Secrets"). CR0012. The Sensor Suite Technology Trade Secrets are reflected in confidential and proprietary materials, including certain schematics and design documents; software and artificial intelligence models (including the sensor fusion software and the various modules therein); physical hardware and components; and certain knowledge and know-how. CR0012-0013.

To develop the Sensor Suite Technology and its autonomous trucking technology more generally, Appellant operated a fleet of over 70 Class 8 trucks (i.e., freight trucks) in the United States, and approximately 30 such trucks in Japan and China, to collect road trip data and test its systems over the course of seven years. CR0013. Collectively, these vehicles travelled over 10 million miles—the equivalent of over 100 years of human professional freight driving experience—to collect data. CR0013. Appellant's personnel and automated software analyzed,

structured, and annotated this data to identify a wide range of road objects and driving behaviors. CR0013.

The data collected over seven years and 10 million miles was used to 'train" Appellant's autonomous driving software and artificial intelligence models so that the software and models can correctly identify objects and conditions; predict the behavior of other drivers and actors; and plan and execute the optimal trajectory of trucks, all in real time. CR0013.

A critical portion of that data, and of the know-how that Appellant developed, pertains to "edge cases" (also referred to as "corner cases")—objects or events that an autonomous vehicle may encounter during operations and that present difficult or hazardous contingencies to the system when they do arise. CR0013. Edge cases include the presence of pedestrians or animals in unusual road settings; the unexpected presence or arrival of first responder vehicles; unanticipated environment conditions; or unexpected driving behavior by other vehicles on the road. CR0013.

Edge case data, and its treatment and annotation, are extremely important to the business of Appellant, because they provide direction and prioritization in the software and model development—that is, which product development problems to tackle and in what order of priority. CR0013-0014. They are also critical in providing direction on how to build a *safe* system that can address even unusual conditions and

events on the road even during "driver-out" operations. CR0014. The know-how developed from testing conducted over seven years and 10 million miles—including its know-how regarding data annotation and direction and prioritization of technology development efforts—constitutes trade secret information of Appellant. CR0014.

Appellant also developed proprietary Automatic Safety Technology to ensure that self-driving trucks equipped with its systems are "fail-safe"—i.e., capable of responding to malfunctions in ways that prevent harm to the system and to persons— and "fail-operational"—i.e., capable of continuing to operate sufficiently to bring the vehicle to a safe stop and to call for attention and repair. CR0014.

Finally, and centrally for purposes of this appeal, Appellant invested several years and hundreds of millions of dollars to develop the Automatic Safety Technology. CR0014. The technology incorporates numerous trade secrets, including those directed to the following: Certain redundant components and systems; the design and requirements for backup components and systems; the operation of such redundant components and systems; the conditions under which such redundant components and systems are invoked; the identification and remediation of faults in hardware and software systems; and the interoperability of such redundant and backup components and systems with primary components and systems. CR0015. The specific details and implementations of these aspects of the

7

Automatic Safety Technology constitute highly valuable trade secrets of Appellant ("the Automatic Safety Technology Trade Secrets"). CR0015. The Automatic Safety Technology Trade Secrets are and were reflected in confidential and proprietary materials, including certain schematics and design documents; software and models; physical hardware and components; testing and validation protocols; and certain knowledge and know-how. CR0015.

Appellant took extensive and cost-intensive measures to ensure that each of the Sensor Suite Technology Trade Secrets, the Autonomous Decision-Making Technology, and the Automatic Safety Technology Trade Secrets (collectively, the "Trade Secrets") are kept confidential. CR0015. Access to materials reflecting the Trade Secrets is and has been limited to only those individuals and employees who require such access in connection with their responsibilities in developing Appellant's autonomous trucking technology. CR0015.

Additionally, Appellant required each employee to sign an Employee Proprietary Information and Inventions Agreement ("EPIIA") that contained specific provisions to protect against disclosure of the Trade Secrets. CR0015-0016. Finally, the Trade Secrets are protected information under a National Security Agreement between Appellant and certain agencies of the United States Government and access to and dissemination of that information is strictly controlled under that Agreement—so long as it remains within the control of Appellant. CR0016.

8

In the fiscal year prior to the tenure of Xiaodi Hou as Appellant's CEO—fiscal year 2021—Appellant spent approximately $260 million on product development and other operations. CR0016. During Hou's tenure as CEO, in 2022, Appellant's capital expenditures rose by over 25%, to approximately $330 million. CR0016. This scale of investment was necessary for the development of the highly complex and advanced technologies that are at the heart of Appellant's business, and to their safe and reliable development. CR0016.

B.   **Hou, and Other Former Employees of Appellant Now Employed by Bot Auto, Had Comprehensive Access to Appellant's Confidential, Proprietary, and Trade Secret Information, and Misappropriated It.**

Xiaodi Hou, co-founder of Appellant, became a leader in the development of Appellant's perception technologies—the sensor suite and perception housing, and the software and models underlying them—and understood them from the ground up. CR0016. Hou was also intimately involved in the collection and processing of trip data and the development of Appellant's edge case know-how. CR0016. Lei Wang was Appellant's head of planning—the head of the development of technologies by which autonomous trucks "plan" their driving activities on the road, in real time. CR0016. Wang worked with Hou on both the development of those systems and the redundant safety systems. CR0016.

In March 2022, Hou was named CEO of Appellant. CR0016. In the second calendar quarter of 2022, Hou promoted Lei Wang to Executive Vice President,

9

Technology, making him the most senior technical employee of Appellant and giving him access, along with Hou, to most, if not all, of Appellant's Proprietary Information. CR0016-0017.

In October 2022, Hou was fired from his post as CEO of Appellant. CR0017. Appellant's Board of Directors based its decision upon its "loss of trust and confidence" in Hou's judgment and leadership, his lack of candor, and as a result of information developed upon investigation—which indicated that Hou had improperly diverted confidential data, design information, and key employee information to a Chinese company that had then been established by Hou's former co-founder of Appellant. CR0017. This incident led to a federal investigation of the potential transfer of Appellant's advanced technology to parties in China, which ultimately cleared Appellant of wrongdoing but led to a severe downturn in Appellant's capital position and to a restructuring of its operations. CR0017.

As a substantial shareholder of Appellant, Hou remained on the board for a brief period of time after his termination, until March 2023. CR0017.

Bot Auto's website domain name was established, upon information and belief, by Xiaodi Hou, on or about December 5, 2022. CR0017. Hou then relocated to Harris County, Texas, incorporated Bot Auto and commenced operations from offices in Harris County. CR0017.

10

On or about December 12, 2022, Appellant learned that several key employees, including Lei Wang, had long been conducting Company work, using Company Proprietary Information (as defined below), on their personal computers. CR0017. Lei Wang informed Appellant that he had already removed such information from his personal computer, but did not advise as to what else he had done with that information. CR0017. An investigation—which was conducted without the knowledge of Hou's plans to establish Bot Auto or the employee solicitation issues discussed below—indicated that Appellant data, source code, and design information, including trade secret information—had indeed resided on the personal computers in question. CR0017-0018.

In late December 2023 and January 2024, Brian Moore, Appellant's former Vice President of Government Affairs and CFIUS Security Officer, reached out to Appellant to attempt to buy from Appellant a truck outfitted with TuSimple's sensor suite and perception housing. CR0018. Moore sought assurances that the identity of the buyer on whose behalf he was acting would not be disclosed. CR0018.

In late January and February 2023, two former and current employees of Appellant communicated to it that they had heard rumors that Hou was establishing a new company, and that he was soliciting key employees of Appellant to join his new venture. CR0018. In early March 2023, Appellant interviewed several such

11

employees, and they all denied having received any such solicitation from Hou. CR0018.

One employee then asked to be interviewed again. CR0018. In that latter interview, the employee advised that he had answered the questions in the previous interview as he had been instructed—by Hou. CR0018. He revealed that Hou had indeed contacted him and solicited his employment at a new venture, and was soliciting multiple key employees of Appellant. CR0018. That employee advised that Hou's first such efforts took place in November 2022, shortly after Hou's ouster as CEO; that Hou still had collaborators in Appellant's employ, working to effect a transition; that Hou had been alerted to the upcoming interviews regarding his solicitation of key Company employees and had contacted those employees prior to their interviews; and that the key employees' cooperation in the investigation of their use of personal computers had been a tactic, intended to cover their tracks in connection with their departure to the new venture. CR0018.

The Board of Directors asked Appellant's outside corporate counsel to conduct a formal investigation, which would entail interviewing Hou. CR0019. Hou resigned from the Board in March 2023 after being notified that he would be interviewed by counsel. CR0019.

The nature of Hou's former positions as CTO and CEO of Appellant required that he have access to Appellant's confidential, proprietary, and trade secret

information, including but not limited to proprietary inventions, artificial intelligence learning models, and both positive and negative "know-how," which Appellant spent significant time and expense creating and developing. CR0019.

As an early employee and director of Appellant from August 2015 until March 2023, Hou's knowledge of Appellant's confidential, proprietary, and trade secret information was developed entirely in Appellant's employ and within the ambit of his contractual and fiduciary duties to Appellant. CR0019. Appellant's employment of Hou is the only employment listed by Hou on his LinkedIn profile, prior to his final departure from Appellant in early 2023; Hou is in fact now the CEO of Bot Auto, but prior to September 27, 2024, listed his employment not as Bot Auto, but as "Stealth Mode." CR0019.

Similarly, Lei Wang also recently listed his current employment, on his public LinkedIn profile, as "Stealth." CR0019. Brian Moore also listed his employment, on his public LinkedIn profile, as "Stealth." CR0019. Upon information and belief, Wang, Moore, and multiple other key former employees of Appellant are now employed by or associated with Bot Auto. CR0019.

Hou, Wang, and the other involved key employees each signed an Employee Proprietary Information and Inventions Agreement ("EPIIA") with Appellant.[1] CR0019.

The EPIIA executed by Hou includes the following language regarding each employee's obligations with regard to Appellant's confidential, proprietary, and trade secret information:

> I agree that all Assigned Inventions (and all other financial, business, legal and technical information regarding or relevant to any Company Interest that is not generally publicly known), including the identity of and any other information relating to Appellant's employees, Affiliates and Business Partners (as such terms are defined below), that I develop, learn or obtain during my employment or that are received by or for Appellant in confidence, constitute "Proprietary Information" [of Appellant]. I will hold in strict confidence and not directly or indirectly disclose or use any Proprietary Information, except as required within the scope of my employment. My obligation of nondisclosure and nonuse of Proprietary Information under this Section shall continue until I can document that it is or becomes readily generally available to the public without restriction through no fault of mine (understanding that breach of this Agreement would be such a fault) or, if a court requires a shorter duration, then the maximum time allowable by law will control.

CR0020.

The EPIIA also includes the following language regarding the survival of the employee's obligations after termination of employment relationship:

---

[1] To be clear, Appellant does not claim for breach of the EPIIA, but cites it here to show that Hou, and the other former employees at issue, know well that the technologies upon which they worked at Appellant were Assigned Inventions and Proprietary Information of Appellant.

I agree that any change or changes in my employment title, duties, compensation, or equity interest after the signing of this Agreement shall not affect the validity or scope of this Agreement. I agree that the terms of this Agreement, and any obligations I have hereunder, shall continue in effect after termination of my employment, regardless of the reason, and whether such termination is voluntary or involuntary, and that Appellant is entitled to communicate my obligations under this Agreement to any of my potential or future employers. I will provide a copy of this Agreement to any potential or future employers of mine, so that they are aware of my obligations hereunder. This Agreement, and any obligations I have hereunder, also shall be binding upon my heirs, executors, assigns and administrators, and shall inure to the benefit of Appellant, its Affiliates, successors and assigns. This Agreement and any rights and obligations of Appellant hereunder may be freely assigned and transferred by Appellant, in whole or part, to any third party.

CR0020.

Hou, and the other key employees of Appellant who ultimately followed him to Bot Auto, were thus aware that all technologies and products developed while they were employed by Appellant constituted Proprietary Information of Appellant. CR0021. For the reasons set forth below, it is now crystal clear that Hou, and the other key employees, have now transferred the key trade secret Proprietary Information discussed above—the TuSimple Sensor Suite Technology Trade Secrets, the TuSimple Autonomous Decision-Making Technology Trade Secrets, and (centrally for purposes of this appeal) the TuSimple Automatic Safety Suite Technology Trade Secrets—to Bot Auto, and that Bot Auto is now utilizing that proprietary trade secret information to solicit investment and take competing products and systems to market. CR0021.

15

At some point in 2024, Bot Auto delivered to potential investors a 'teaser' document, succinctly stating to those potential investors its value proposition. CR0021. In particular, in that solicitation document Appellee represented that it would achieve "driver-out" operations within approximately one year after the commencement of its operations, and would achieve "full operations" of an initial commercial fleet within two to three years—rather than the seven years required by every competitor in the sector before it. CR0021. Appellee proudly stated that it would achieve these results upon the investment of a fraction of the capital required by other competitors, and critically, stated that it could do so because, only months after its formation, Hou and its "team" already had "experience and knowledge about the exact and shortest path to commercialization" and "the latest technologies." CR0021.

In August of 2024, Appellant began to discern the full depth and breadth of Bot Auto's misappropriation and misuse of Appellant's trade secret information and technologies. CR0021. This transpired, in part, because of Hou's own words, as stated to Chinese media. CR0021.

On August 5, 2024, however, the mainland Chinese technology trade publication Jia Zi Guang Nian published an interview with Hou. CR0022. That interview amounts to an outright admission, by Hou, of the gravamen of Appellant's claims here. CR0022.

16

In that interview, Hou admitted that Bot Auto is effectively his own closely-held and controlled successor company to Appellant. CR0022. As the interviewer correctly stated, "After leaving [Appellant], Hou Xiaodi once again started a L4-level driverless truck startup and established a new company, Bot Auto, in the United States." CR0022. And as Hou himself stated, "[t]rucks are closer to commercialization, which is why I want to continue working on unmanned trucks after leaving [Appellant]." CR0022. Furthermore, Hou explicitly indicated that going forward he would be focused on developing technology to deal with the edge cases that had been largely mastered by the years of work and investment devoted to that challenge by Appellant. CR0022. Hou drew a contrast between the work of his new venture Bot Auto and that of Tesla's Full Self-Driving ("FSD") effort: "Tesla's business is to sell cars, and FSD is the added value of selling cars. CR0022. If you want to consider how to sell more cars, you can't go deep into a limited area like L4 and solve all corner cases in this area." CR0022.

Hou furthermore clarified that he had no intention of developing Bot Auto's edge case know-how independently using simulated training data—and thus, necessarily, would require millions of miles of real-world road trip data to achieve the same degree of know-how that Appellant developed:

> For example, the story told by Waabi (an autonomous driving company founded in 2021) is that simulation is the best in the world, everything is just like the real world, and there is no problem that simulation cannot

17

solve. But I don't believe this story, because the last 1% of the problems in simulation [*i.e.*, the edge cases] are the most difficult.

[….]

**The most extreme argument I have heard is that the distance of autonomous driving can be conquered, which is a corner case of tens of millions of kilometers and a large amount of computing power.** This is a typical case of living in one's own fantasy world.

CR0023-0023.

Hou furthermore acknowledged the criticality of the redundant systems developed at Appellant: "Hou Xiaodi still proudly tells 'Jia Zi Guang Nian' today that Appellant is the world's first company to test fully driverless heavy trucks on open roads, and has achieved the first half of the driverless game—creating a system with safety redundancy." CR0023. As Hou then stated in detail:

> The core of autonomous driving L4 is how to complete a stable system, especially using unstable modules to complete a stable system. For example, if the camera fails to detect an object in one frame, this will definitely happen. How to ensure that our system does not crash is the key.
>
> The dumb way is to reduce the failure rate from once every 100,000 kilometers to once every 1 million kilometers, so that the system is stable. The smart way is to innovate at the architecture level, so that when one module fails, there are other modules to back it up. We have several more layers of back-up solutions, so that we can handle failures at any time in the system.

This "smart way to innovate at the architecture level" is, itself, Appellant's trade secret design. CR0023.

Remarkably, Hou admitted that he has little appetite for the hard work of actually *building* a successful company—and was far more focused on swiftly and simply reaching his goal: "I don't enjoy the process of entrepreneurship, I only look at the end. In the end, this business can be accomplished, and the light of hope emitted by this ultimate vision is attractive to me." CR0023.

And finally, Hou effectively admitted that Bot Auto "adopted" and is now using advanced technology that it could not possibly have independently developed, in the few months of its operations and upon an infinitesimal fraction of the investment and effort devoted by Appellant, without the benefit of Appellant's trade secret information:

> People always ask me, are you end-to-end? To maintain academic rigor, we are really more than end-to-end. **But what they actually want to ask is, have you adopted more advanced technology? Of course we have.**
>
> [....]
>
> **Although Bot Auto has world-leading technology, we do not claim to be a technology company, but a pragmatic operation company.** We use the world's most advanced technology to operate well.

As Hou here openly admitted, Bot Auto is not a technology company, but does indeed have world-leading technology—Appellant's technology. CR0023-0024.

Bot Auto raised investment capital in support of its deployment of Appellant's technology and know-how. CR0024. Specifically, Bot Auto publicly stated that it

raised some $10.5 million in investments thus far, and on Friday, September 27, 2024, Bot Auto publicly announced that it had raised $20 million in funding. CR0024.

More troublingly, for purposes of Appellant's ongoing business and its efforts to protect and deploy its technology and know-how, Bot Auto sought and received investment capital from multiple sources overseas, including sources from the People's Republic of China. CR0024. Specifically, Hou participated in "road shows"—that is, investment solicitation efforts—in cooperation with M31 Capital, a prominent investment fund operating in Beijing and Shanghai, China. CR0024. In those efforts, Hou traveled with M31 personnel to, at least, London, United Kingdom and to Riyadh, Saudi Arabia; Doha, Qatar; and Abu Dhabi, United Arab Emirates. CR0024. In connection with the London delegation—and despite Bot Auto's headquarters facility and operations in this District—M31 Capital described Hou as one of "30 top Chinese entrepreneurs," and in connection with the delegation to the Middle East, as a member of "an elite delegation of senior Chinese CEOs and executives." CR0024.

Certain of the investors identified in Bot Auto's September 27, 2024 announcement of its most recent capital raise, including Cherubic Ventures, Linear Capital, and M31 Capital, maintain their principal places of business overseas in locales including the Cayman Islands and the People's Republic of China. CR0025.

20

Appellant expended considerable resources and effort, in cooperation with appropriate agencies of the United States Government and pursuant to a detailed National Security Agreement with the Departments of Defense and the Treasury, to ensure that its advanced technologies will remain securely within the United States. CR0025. Access to those technologies is governed by an Access Control List, which limits access to US employees who have passed checks, and is on a need-only basis. CR0025. Foreign employees and contacts are not allowed access. CR0025. Furthermore, on the platforms where Appellant maintains its trade secrets, including source code, there are over 2,100 separate access-controlled data repositories, each with its own vetted administrator; Hou and Wang, as technical executives, had access to all of these repositories. CR0025.

Bot Auto's, and Hou's, efforts to misappropriate Appellant's trade secret technologies and information are animated in substantial part by their intention to circumvent these controls, and enable the deployment of those technologies and information overseas, and for the benefit of non-U.S. persons. CR0025. In fact, Hou himself, as CEO of Bot Auto, falsely represented to at least one potential investor that Appellant's recent restructuring resulted from Appellant's need to comply with its arrangements with the United States Government to ensure protection of the technologies in question, and truthfully represented to that potential investor that Bot Auto will not regard itself as being similarly constrained. CR0025. This raises the

21

acute risk that Appellant's proprietary technology, know-how, and information will be transferred, by Bot Auto, to unknown parties overseas, and thus Appellant's business will be damaged in ways that will barely be subject to discernment, much less to ready calculation, and that will be irreparable. CR0025-0026.

In its promotion of its business to potential investors, Bot Auto admitted that it is operating in direct competition with Appellant. CR0026. In fact, Bot Auto's statement of its market offering is a copy of Appellant's value proposition. CR0026. Bot Auto's investment proposal documents state that it "offers middle-mile autonomous Transportation-as-a-Service (TaaS), on highways and surface streets, hub to hub"—the very same market offering described by Appellant in its previous IPO filing, and in many other investor presentations, during Hou's tenure with Appellant. CR0026. It is important to emphasize that, for all the reasons set forth herein (and many more), *it is flatly impossible* for Bot Auto to achieve "driver-out" operations in **one year** (as opposed to seven years or more), and full commercialization of autonomous trucking services in two to three years, ***without the theft and misuse of Appellant's critical trade secrets***, developed as they were over the course of years and upon the investment of hundreds of millions of dollars. CR0026.

Yet further investigation revealed that many key former employees of Appellant have now entered the employment of Bot Auto, including but not limited

to Appellant's former Director of Corporate Strategy; Chief of Staff; Business Research and Senior Program Manager; Senior Software Engineer; Senior Mechanical Engineer; and Senior Accounting Manager. CR0026. Upon information and belief, additional key employees have also entered the employment of Appellee, including but not limited to Appellant's Director of Planning and Prediction; Senior Staff Software Engineer; Senior Manager for Lateral Control; and two Senior Technical Program Managers. CR0026.

Upon yet further investigation, Appellant learned that Bot Auto had in fact established an operational facility in the Houston area. CR0026. This was consistent with information received in the course of the aforementioned employee solicitation investigation, which indicated that Hou had informed the solicited employees that he was moving to Texas. CR0026-0027. Upon information and belief, including but not limited to the timeline of events as embodied in the review of Appellant employees' uses of personal laptops and the investigation of Hou's solicitations of Appellant employees, Hou and Bot Auto undertook much of the conduct constituting the misappropriations of Appellant's trade secrets in Harris County. CR0027.

Recent investigation revealed that Bot Auto is now openly conducting product development operations **using Appellant's trade secret technology**. CR0027. Specifically, investigation revealed that, upon the public roads in the Houston metropolitan area, Appellee is testing a sensor suite and perception housing

23

arrangement that is visibly functionally identical to the sensor suite and perception housing developed by Appellant, utilizing the same arrangement and alignment of sensors and thus necessarily a functionally identical set of software and artificial intelligence systems, and collecting data with that trade secret technology. CR0027.

Furthermore, Hou's statements to media and to investors—that Bot Auto will achieve "driver-out" operations within one year and upon the investment of a tiny fraction of the capital required by Appellant and its competitors—could not be even colorably true, unless Bot Auto is also utilizing the edge case know-how generated in the course of Appellant's product development during Hou's tenure with Appellant. CR0027. As stated above and as set forth in further detail in the Lu Declaration, that know-how is the product of millions of miles of testing and data collection, utilizing nearly 100 development vehicles, over the course of seven years and upon the investment of hundreds of millions of dollars. CR0027. Bot Auto has operated its business for less than one year, and upon information and belief, has to date raised approximately only $20 million in liquid funds and operates, not 100 test vehicles, but two. CR0027.

Finally, Hou's statements could not be true, and Bot Auto could not be conducting the development operations it has been conducting with the two test vehicles it has been operating on Houston-area roads, were it not also utilizing Appellant's proprietary designs of redundant power and steering systems. CR0028.

24

Additionally, the key former Company employee in charge of the development of such systems—the former Executive Vice President for Technology Lei Wang—was a central subject of the investigation of key employees' uses of personal computers containing Appellant Proprietary Information, and of the aforementioned solicitation investigation. CR0028. Upon the information received in the course of those investigations, Lei Wang was in fact one of the then-current employees of Appellant who colluded with Hou to effect the wholesale transfer of these key technologies to Bot Auto. CR0028.

For all the foregoing reasons, it is thus now clear beyond reasonable dispute that Bot Auto misappropriated critical trade secret information, know-how and technologies of Appellant. CR0028. By the public admissions and activities of Bot Auto's own founder and CEO, Xiaodi Hou, it is clear that Appellee is developing competing products and systems utilizing that trade secret information; soliciting investment from Chinese and other overseas investors in support of further such activities; and preparing imminently to take competing products and systems to market. CR0028.

For all the foregoing reasons, and upon further information and belief, Bot Auto conspired with Hou, Wang and other persons to effect the misappropriation and misuse of Appellant's trade secret information and technology set forth herein, beginning no later than late 2022. CR0028. In the alternative, those persons have

25

aided and abetted Bot Auto's misconduct, or otherwise engaged in actionable concerted action to that end. CR0028.

For all the foregoing reasons, Appellant now faces the risk of business-critical damages, many if not most of which will not be compensable by pecuniary remedies. CR0029.

## SUMMARY OF THE ARGUMENT

The trial court erred in denying Appellant's Application for Temporary and Permanent Injunction because Appellant presented more than the minimally required "some evidence" of the probable right of recovery, and of probable, imminent, and irreparable harm, that Appellant was required to show in order for the Court to grant the temporary injunction. More specifically, Appellant presented clear and convincing evidence – indeed, overwhelming, direct evidence – of misappropriation of specific trade secrets pertaining to its Autonomous Decision-Making Technology and its Automatic Safety Systems Technology, and upon that showing imminent and irreparable harm was properly to be presumed as a matter of Texas law. Pursuant to Texas Civil Practice & Remedies Code § 51.014(a)(4), Appellant thus files this appeal following the trial court's denial of Appellant's application.

The development and realization of each of the Sensor Suite Technology, Autonomous Decision-Making Technology, and TuSimple Safety Technology, were the result of—and were only made possible by—years of work, hundreds of thousands of hours of research and development, hundreds of millions of dollars, and millions of miles of testing.

Each of these technologies and capabilities includes trade secrets of Appellant. Each conveys a crucial competitive advantage to Appellant, as well as

27

substantial potential public benefits. Because of the crucial competitive advantages of these technologies, the details and specific implementation of each of these technologies were and have been kept highly confidential by Appellant. Each of these technologies and capabilities has now been misappropriated, and now is being surreptitiously misused, by Bot Auto.

Appellant learned of the misappropriation of its trade secrets and their misuse by Bot Auto recently. Bot Auto has already deployed testing vehicles that visibly incorporate TuSimple's Sensor suite and housing, and has made specific statements to potential investors regarding its capabilities and intentions that demonstrate beyond reasonable dispute that it has also misappropriated Appellant's know-how regarding road conditions and edge cases, and Appellant's redundant safety systems technologies. This misappropriation presents a business-critical threat to Appellant, which markets its technologies to autonomous trucking concerns in the United States and worldwide, and which faces the loss of inestimable value as a result of Bot Auto's actions. Moreover, Bot Auto has been raising investment capital from sources overseas, raising the acute risk that Appellant's technologies will be dissipated beyond any hope of recovery or recompense

Appellant initially filed suit and sought a temporary injunction against Bot Auto for violations of the Texas Uniform Trade Secrets Act, but, despite Appellant having satisfied the requirements for entering a temporary injunction, the trial court

erroneously denied TuSimple's application and dissolved the temporary restraining order it previously entered. CR1091-1093. However, the aforementioned assertions and the evidence of record are sufficient to (1) establish proof of each element required to show Bot Auto misappropriated Appellant's trade secrets, and in particular, the Automatic Safety Technology, in violation of TUTSA, (2) show some evidence of a probable right of relief sought, and (3) show probable, imminent, and irreparable harm to Appellant in the interim of the underlying lawsuit. Thus, respectfully, the trial court abused its discretion, and the Court of Appeals should reverse the trial court's decision and remand with instructions to enter the requested temporary injunction against Bot Auto.

## **STANDARD OF REVIEW**

In Texas, the standard of review for an appellate court when reviewing a trial court's denial of a temporary injunction is whether the trial court abused its discretion. *Navarro Auto-Park, Inc. v. San Antonio*, 580 S.W.2d 339, 340 (Tex. 1979); *Wylie Indep. Sch. Dist. v. TMC Founds., Inc.*, 770 S.W.2d 19, 21 (Tex. App.—Dallas 1989). The question here is "whether there has been a clear abuse of discretion by the trial court in determining whether the [appellant] is entitled to a preservation of the status quo pending trial on the merits." *Brooks v. Expo Chem. Co.*, 576 S.W.2d 369, 370 (Tex. 1979). A clear abuse of discretion occurs when the trial court's decision is arbitrary and capricious, amounting to clear error. *Argo Grp. US, Inc. v. Levinson*, 468 S.W.3d 698, 700 (Tex. App.—San Antonio 2015, no pet.). "[T]he merits of the underlying case are not presented for appellate review in an appeal from an order granting or denying a temporary injunction." *Brooks v. Expo Chem. Co.*, 576 S.W.2d at 370.

## ARGUMENT

### I. ARGUMENTS & AUTHORITIES

Pursuant to Rules 680 – 693 of the TEXAS RULES OF CIVIL PROCEDURE, TEXAS CIVIL PRACTICE AND REMEDIES CODE Section 65.011, and principles of equity, injunctive relief is necessary to preserve the status quo pending a final judgment or other disposition of an action and to restrain one party from committing further violations of another's rights that would tend to render a judgment ineffectual, resulting in no adequate remedy at law for the aggrieved party. "Injunctive relief is recognized as a proper remedy to protect confidential information and trade secrets." *Rugen v. Interactive Bus. Sys.*, 864 S.W.2d 548, 551 (Tex. App.—Dallas 1993, no writ) (citing *Hyde Corp v. Huffines*, 158 Tex. 566, 314 S.W.2d 763, *cert. denied*, 358 U.S. 898 (1958)). Moreover, an injunction may be the only effective relief an employer has where its former employees possess its confidential information and are in a position to use it to compete with their employer. *Id.* (citing *Weed Eater, Inc. v. Dowling*, 562 S.W.2d 898, 902 (Tex. Civ. App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.)). Temporary injunctive relief is proper if the moving party shows proof of: (1) a cause of action against the defendant, (2) a probable right of relief sought, and (3) a probable, imminent, and irreparable harm in the interim. *Good Shepherd Hosp., Inc. v. Select Specialty Hosp. - Longview, Inc.*, 563 S.W.3d 923, 927 (Tex.

31

App.—Texarkana 2018, no pet.) (citing *Hartwell v. Lone Star, PCA*, 528 S.W.3d 750, 759 (Tex. App.—Texarkana 2017, pet. dism'd)).

However, the moving party need <u>not prove that it will ultimately prevail</u> at trial to demonstrate a probable right to relief. *See Keystone Life Ins. Co. v. Mktg. Mgmt., Inc.*, 687 S.W.2d 89, 92 (Tex. App.—Dallas 1985, no writ). The party need only show *some evidence* to support each element of its claim. *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 200 (Tex. App.—Fort Worth 2005, no pet.).

A violation of TUTSA consists of a misappropriation of trade secrets. TUTSA defines "misappropriation" in six discrete forms:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who:
>
>> (i) used improper means to acquire knowledge of the trade secret;
>>
>> (ii) at the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:
>>
>>> (a) derived from or through a person who used improper means to acquire the trade secret;
>>>
>>> (b) acquired under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the trade secret; or

(c) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of or limit the use of the trade secret; or

(iii) before a material change of the position of the person, knew or had reason to know that the trade secret was a trade secret and that knowledge of the trade secret had been acquired by accident or mistake.

Tex. Civ. Prac. & Rem. Code § 134A.002(3).

TUTSA defines a "trade secret" as:

all forms and types of information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedure, financial data, or list of actual or potential customers or suppliers, whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if:

(A) the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

Tex. Civ. Prac. & Rem. Code § 134A.002(6).

A.   **Pivotal Cases**

1.   *IAC, Ltd. v. Bell Helicopter Textron, Inc.*

*IAC, Ltd. v. Bell Helicopter Textron, Inc.* is a seminal trade secret / injunction case wherein the appellate court found that injunctive relief was proper. *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 196 (Tex. App.—Fort Worth 2005, no pet.) The facts of *Bell Helicopter* are remarkably similar to the case at bar. In *Bell Helicopter*, the defendant was a manufacturer of helicopter blades for Bell Helicopter. *Id.* at 196-197. As such, the defendant had access to Bell's proprietary information related to the blades; however, the defendant agreed to keep the proprietary information confidential and to only use the information for Bell's benefit. *Id.* Defendant then began working with a competitor and started to manufacture, market, and sell helicopter blades similar to Bell's blades. *Id.* Bell Helicopter then brought suit for trade secret misappropriation and injunctive relief. *Id.* The trial court and appellate court found that injunctive relief was proper. *Id.*

In reaching its holding, the appellate court noted that injunctive relief was appropriate because (1) Bell had taken measures to protect the blade data, (2) Bell had expended significant money on developing the blade data, (3) the blade data was highly valuable, and (4) the blade data is difficult to be duplicated by others. *Id.* at 198-199. To that end, the evidence before the court in support of the aforementioned was: (1) examples of the measures taken to protect the data, such as confidentiality

agreements, limited access to the data, badges and check in/out processes used, guards, and vault; (2) testimony regarding the thousands of hours used to develop the data; (3) testimony regarding how the data is worth millions of dollars; and (4) testimony regarding the extreme difficulty in duplicating the data. *Id*. Thus, the court found that the blade data was entitled to trade secret protection.

The court went on to evaluate whether there was evidence of trade secret misappropriation. *Id*. at 199-200. In finding there was possible misappropriation, the court relied on testimony that the defendant had access to proprietary blade data for a specific use (to make Bell Helicopter blades) and that such disclosure to the defendant was subject to a confidentiality agreement. *Id*. Further, the evidence showed that the defendant worked with a competitor of Bell Helicopter, had the blade data in its library, and the competitor had access to the data. *Id*. Further, the blades of the competitor were similar to Bell Helicopter's. *Id*. Thus, the court found there was a reasonable inference of trade secret misappropriation. *Id*.

Lastly – with respect to probable, imminent, and irreparable injury, and at the heart of this appeal – the court found that ***harm may be presumed***, because evidence supported that the defendant was in possession of Bell Helicopter's trade secrets and was in a position to use them by working with a competitor. *Id*. at 200. The court went on to state that "*[t]he threatened disclosure of trade secrets constitutes*

35

*irreparable injury as a matter of law*." *Id.* (emphasis added). Thus, the court found injunctive relief was proper.

### 2. *T-N-T Motorsports v. Hennessey Motorsports*

In *T-N-T Motorsports v. Hennessey Motorsports*, the appellate court found that an injunction was proper to enjoin employees from misappropriating the trade secrets of their prior employer. *T-N-T Motorsports v. Hennessey Motorsports*, 965 S.W.2d 18, 24 (Tex. App.—Houston [1st Dist.] 1998). In *T-N-T*, Hennessey hired two employees to help produce special parts for a Dodge Viper. *Id.* at 20-21. During their employment with Hennessey and with Hennessey's knowledge, the two employees formed their own shop (T-N-T) and simultaneously worked with Hennessey and T-N-T. *Id.* The two employees produced the special parts at the T-N-T shop for the benefit of Hennessey, but also sold other parts directly to outside customers with Hennessey's knowledge. *Id.* The two employees never signed a confidentiality agreement with Hennessy. *Id.* Nonetheless, the two employees acquired their special knowledge about the special parts through their time with Hennessey. *Id.* The two employees eventually left Hennessey and began working for T-N-T full time. *Id.* The two employees and T-N-T then began selling the special parts directly to outside customers and directly competing with Hennessey. *Id.* The court held that the special parts were entitled to trade secret protection and that Hennessey was entitled to an injunction. *Id.* at 24.

In reaching its holding, the court found that Hennessey told the employees that the information related to the special parts was proprietary, spent substantial money developing the parts, spent substantial time developing the parts, and spent substantial effort protecting the confidentiality of the parts. *Id.* at 22-24. The court also noted the efforts used to keep the information secret, such as limited individuals being given access to the protected information, passwords used, where the information was stored, and the remote location of Hennessey's shop. *Id.*

The court then went on to discuss the specific elements of injunctive relief. *Id.* at 23-24. The court found that all elements of injunctive relief were met because the two employees possessed confidential information and were in a position to use it. *Id.* In support thereof, the court cited evidence such as the employees' position of trust and access to confidential information while employed with Hennessey, one employee's position as director of operations with Hennessey, the specialized knowledge acquired by the employees while employed with Hennessey, and that Hennessey expended substantial time and money to develop the special parts. *Id.* The court then went on to reference testimony that Hennessey and T-N-T were in the same business of custom high performance automotive upgrades. *Id.* Thus, the court held that the two employees "possess[ed] [Hennessey's] confidential information and [were] in a position to use it to compete directly with [Hennessey]." *Id.*

The court then discussed probable, imminent, and irreparable injury. The two employees argued that Hennessey's damages were compensable through money damages and, thus, prevented the availability of injunctive relief. *Id*. The appellate court, however, found that there was no legal remedy because "[i]njunctive relief is proper to prevent a party, which has appropriated another's trade secrets, from gaining an unfair market advantage" and that the "only effective relief available to [Hennessey] is to restrain [the employees'] use of its trade secrets and confidential information…." *Id*. In support thereof, the court cited testimony from Hennessey's principal that, if the information was used by the employees, Hennessey would lose its market advantage, sales would decrease by millions of dollars, and the company would lose immeasurable goodwill. *Id*. As a result, the court held that damages could not be easily calculated and, therefore, a legal remedy was inadequate. *Id*.

B.      The Case at Bar: CreateAI Holdings, Inc. v. Bot Auto TX, Inc.

Here, as in *Bell Helicopter* and *T-N-T*, injunctive relief in favor of Appellant is warranted.

> 1.      **The trial court erred in denying Appellant's Application for Temporary Injunction because Appellant presented clear evidence that Bot Auto misappropriated its trade secrets and thus of a probable right of relief.**

Texas courts have held that, at a preliminary hearing for injunctive relief, the applicant is not required to prove it will prevail at final trial. *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex. 1968). To be entitled to a temporary injunction, an

38

applicant must plead a cause of action, show a probable right to recover on that cause of action, and show a probable injury in the interim. *Sun Oil*, 424 S.W.2d at 218; *Manufacturers Hanover Trust Co. v. Kingston Inv. Corp.,* 819 S.W.2d 607, 610 (Tex. App.—Houston [1st Dist.] 1991, no writ). "A probable right of success on the merits is shown by alleging a cause of action and presenting evidence that tends to sustain it." *T-N-T Motorsports v. Hennessey Motorsports*, 965 S.W.2d 18, 23-24 (Tex. App.—Houston [1st Dist.] 1998).

Moreover, Texas courts have steadfastly held that an employer's attempts to keep information confidential, an employee's involvement in developing, researching, or otherwise working on said confidential information—and the employee having access to the information—and the underlying data that establishes that information, which is not otherwise publicly known, was identical to the alleged competitor's data is **sufficient to establish a reasonable inference that the data was obtained by breaching the confidential relationship between employer and employee.** *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 199-200 (Tex. App.—Fort Worth 2005, no pet.).

Prior to leaving Appellant's employ, Hou was the founder, CEO and CTO, and a Director, of Appellant. Due to his position, Hou performed specific tasks that assisted in the creation, design, development, testing, and assembly of the interworking systems that comprise Appellant's AVS technology. Hou worked in

the employ of, and in conjunction with, Appellant to strategize product development. Hou also has admitted that both Appellant and Bot Auto are in the business of creating AVS, and that Bot Auto has "adopted" and is now using advanced technology that it could not possibly have independently developed.

Thus, while Hou was employed by Appellant, he more than almost anyone gained valuable, proprietary, and trade secret information about Appellant's AVS technology. Hou and his current collaborators were given access to vendors who could fabricate, modify, and supply parts for Appellant's AVS technology, and knew which were the best and most reliable. Hou and others under the employ of Appellant developed know-how of how the placement of certain sensors could affect their efficacy and which systems worked best in conjunction with one another. Further, Hou was given access to data and to Appellant's know-how regarding the curation and structuring of that data—derived from years of data gathering and analysis and millions of dollars of funding—that provides the foundation for Appellant's AVS interworking systems.

Hou (and his current collaborators) possessed exceptionally deep and wide-ranging confidential, proprietary, and trade secret information of Appellant and, upon his departure, put himself and his current collaborators in a position to use it to compete directly with Appellant. Under these circumstances, Defendant has been

using this information to Appellant's detriment. The use of this information poses an inherent threat of the disclosure and use of Appellant's trade secrets.

Moreover, Appellant has shown, by overwhelming and unrebutted documentary and testimonial evidence, that its trade secret information pertaining to its Sensor Suite Technology, Autonomous Decision-Making Technology, and Automatic Safety Systems Technology, is in fact proprietary and valuable. *See, e.g.*, 8RREX124, 7RREX57, 7RREX63, 7RREX65, (demonstrating ongoing efforts to realize value of technologies in collaboration with prominent global investment bank); 5RR288:9-15 (testimony of Cheng Lu) ("We spent hundreds of millions of dollars, I mean, approximately $1.4 billion to develop technology for self-driving…."); 6RR77:06-78:09; (recounting ongoing efforts to license small portions of proprietary trade secret information, for millions of dollars in licensing fees). Appellant has also shown, beyond any reasonable dispute, that it has undertaken very extensive measures to ensure the confidentiality of that highly valuable information (of which Hou and his collaborators were perfectly aware). *See*, *e.g.*, 7RREX66 (Employee Handbook); 7RREX15 (Employee Proprietary information and Inventions Agreement); 7RREX12 (National Security Agreement); 8RREX118 (NSA compliance report, bearing Hou's signature); 5RR205:9-208:15 (testimony of Cheng Lu) (describing policies and practices pertaining to confidentiality of proprietary information); 5RR117:8-24 (Hou admitting signing the EPIIA);

41

5RR236:05-237:01 (addressing the fact that Hou signed the compliance report and thus knew the entire panoply of policies and procedures to protect trade secret information and covered IP).

Appellant has also amply shown, by independent documentary evidence and by the testimony of Mr. Lu and the testimony of Hou himself, that the Defendant has in fact misappropriated Appellant's highly valuable proprietary information. Even at this early stage the Defendant's own records have revealed specific, concrete instances in which Appellant's trade secret information has appeared, not only in Bot Auto's possession, but in Bot Auto's active and ongoing use. With regard to the Appellant's trade secrets, and *without any factual rebuttal, anywhere in the record*, Bot Auto's own documents have shown that Bot Auto does, in fact, have, and is, in fact, exploiting, the proprietary design and architecture of Appellant's Automatic Safety Systems Technology. Bot Auto's *own documents* revealed that it is using the same dual-CAN Bus design and architecture to achieve redundancy in its braking system that Appellant has used, and that that design and architecture are also proprietary and confidential to Appellant. *See* 8RREX135:053 (Appellant's braking system design diagram, showing dual-CAN Bus design and architecture); 6RR74:1-75:17 (testimony of Lu, specifying that this specific system design and architecture, utilizing dual CAN Bus components to achieve redundancy in braking system, constitute Appellant's trade secret information); 8RREX133:011 (Bot Auto braking

42

system requirements document, showing use of dual-CAN Bus design and architecture to achieve redundancy in braking system); 5RR115:3-116:3 (testimony of Hou, authenticating 8RREX133).  Similarly, Bot Auto's *own documents* revealed that it is also using a specific redundant steering system design that is *identical* to that previously utilized by Appellant, as demonstrated by the identity of the key parameters used to validate that system as specified within Bot Auto's own steering system requirements document. *See* 8RREX136:011-8RREX136:015 (Appellant steering system document, specifying key parameters utilized to validate redundant steering system); 6RR65:16-68:19 (testimony of Lu, explaining how identity of validation parameters would demonstrate identity of steering system design); 8RREX132:003-8RREX132:004 (Bot Auto steering system requirements document, showing identical parameters for steering system); 5RR114:15-21 (testimony of Hou, authenticating 8RREX132).

In each of the*se* instances, Bot Auto's *own documents of record, authenticated by Bot Auto's own principal,* show beyond meaningful dispute that Bot Auto now has in its possession, and is actively exploiting, multiple aspects of Appellant's trade secret information.  In each of these instances, Bot Auto's *own* files have revealed direct and decisive evidence of the fact that Bot Auto has done precisely what Appellant says it has done. This direct, decisive, independent evidence of Bot Auto's misappropriation of these discrete and concrete instances of Appellant's trade secret

43

information, as revealed even at this early stage and even standing alone, virtually requires that the requested temporary injunction be entered.

Yet there is much, much more. The evidence of Bot Auto's misappropriation of the Autonomous Decision-Making Technology, and specifically of misappropriation of Appellant's semantic regime for the annotation of road trip data and Appellant's annotation process design, is similarly overwhelming. 7RREX55:008-7RREX55:012 (TuSimple "edge case" annotation semantics curve); 7RREX73:020-7RREX73:026 (addressing Bot Auto's approach to annotation of edge/corner cases); 6RR38:22-41:11, 6RR46:8-12 (Lu explaining that semantic regime/annotation process is proprietary); 7RREX55:008; 6RR38:22-6RR42:14, 6RR49:8-12 (green/red terminology was developed at Appellant). The entirely-competent circumstantial evidence of misappropriation of the Autonomous Decision-Making Technology is also decisive, and unrebutted: Hou's collaborator and apparent tortious concerted actor Lei Wang, and many of the other key solicited employees, engaged in deliberate deceit *en route* from Appellant to Bot Auto. *See* 5RR241:15-5RR243:2 (Lu on laptop investigation); 6RR55:8-24 (Lu on Lei Wang being central subject of solicitation investigation). Hou, Wang, and other key solicited employees were working specifically on, and remain focused on, the autonomous decision-making technology at Appellant and its derivative technology at Bot Auto, *see* 6RR51:19-52:13). And there is no realistic prospect that Bot Auto

has independently developed an entirely new semantic scheme and annotation process, in its short life, without misappropriating those aspects of the Autonomous Decision-Making Technology, *see* 6RR52:23-55:06 (unrebutted testimony of Lu, specifying and explaining that such independent development would take years and very substantial investment).

This conclusion, specifically with regard to Bot Auto's misappropriation of the Autonomous Decision-Making Technology, is finally mortared into place by Hou's own outright falsehoods to the Court. *Inter alia*, Hou asserted that Bot Auto had developed, in its short lifespan, an entirely new annotation semantics regime and annotation process with no human involvement – but then admitted that there is human involvement, just like the regime and process developed by Appellant; Hou asserted that Appellant did not utilize transformer technology or Kubernetes, when the documentary record shows the opposite; and Hou fantastically asserted that there are "no similarities" between Bot Auto's technology and business, and those of Appellant, when the record is replete with instances of such similarities. *See* 5RR132:11-133:25 (Hou admitting that some human annotation is in fact required) 5RR161:13-24 (Hou asserts that TuSimple was not using transformer technology); 5RR188:17-20 (Hou stating that TuSimple is not using Kubernetes); 5RR96:17-25 (no similarity between placement of sensors); 5RR109:19-110:16 (Hou on autonomous decision-making), 5RR260:12-261:10 (Lu re: business model

similarities), 6RR147:23-148:2 (Lu re: similar perception housing); 7RREX36, 8RREX135; 8RREX136; 7RREX63; 6RR56:16-58:21 (Lu testifies that Kubernetes has existed since 2014 and has been used by TuSimple since 2019); 7RREX65; 6RR58:23-61:14 (Lu testifies that transformer technology was and is in use by Appellant, with contemporaneous documentary corroboration). Indeed, Hou himself admitted, on the stand and under oath, that he as the founder, principal and CEO of Bot Auto is of the impression that "candor is a very subjective matter." 5RR152:1-4 ("Do you believe that a failure of candor to the board would constitute some sort of wrongdoing? A: I do not because candor is a very subjective matter.").

These many, specific, visible falsehoods, perpetrated by Bot Auto's founder, principal and CEO, under oath, as to matters that are entirely within his personal knowledge, not only undermine Bot Auto's threadbare defense, they also support the very same conclusion that is affirmatively compelled by the other evidence of record: To wit, that Bot Auto has indeed misappropriated multiple instances of trade secret information contained within the Autonomous Decision-Making Technology (just as the direct, documentary, "smoking gun" evidence establishes Bot Auto's misappropriation of multiple other instances of TuSimple's trade secret information).

And in addition to Hou's deceased personal credibility, the circumstantial case, even in its most general contours, would suffice to support the entry of the

requested injunction, in this case and in most trade secret cases. As the record shows, Hou himself has a fairly astounding history of disregarding information security controls, *see* 5RR134:19-143:19 (Hou asserts he was cleared by wrongdoing, despite public record of earnings call reporting his termination); 5RR236:5-237:13 (Cheng Lu testifies as to grounds for Hou's firing); 5RR234:14-235:6 (information was shared by Hou without proper controls; should have been NDA/cooperation agreement in place). Bot Auto has poached over thirty key employees of Appellant, many of whom were involved in the scheme to cover their tracks, under Hou's personal direction, that was revealed by Appellant's solicitation investigation, and in the laptop incident that was orchestrated by Wang and by Hou as a smokescreen. 5RR247:19-252:16; 6RR55:8-24 (regarding laptop and solicitation investigations). The Defendant is in the very same business, operating the very same business model of transportation-as-a-service. 5RR256:22-257:14; 6RR13:22-16:13 (regarding same). The Defendant now purports to have leapt past previous stages of development, straight to cost reduction – which could not possibly have happened without misappropriation of Appellant's trade secret information. 5RR63:5-64:2, 5RR161:1-12, 6RR10:4-13:24 (regarding developmental process); 7RREX56 (investment teaser) (same). Bot Auto now asserts to potential investors that it will achieve in one year – a timeframe that Hou confirmed upon the stand – what took Appellant seven years to achieve, upon the investment – under Hou's leadership –

47

of over a billion dollars rather than tens of millions. 5RR161:1-12, 5RR288:8-15. And as set forth above, the independent documentary record, and Hou's own testimony, show that his explanation for these remarkable claims – that Bot Auto now has access to technologies that Appellant did not – is a visible and deliberate lie. 5RR161:13-24 (Hou stating that Appellant not using transformer technology for anything running in the vehicle); 5RR188:17-20 (Hou stating that Kubernetes did not exist during Appellant's tenure); 6RR58:3-21 (Lu stating Hou lied and that Appellant does use Kubernetes), 6RR61:15-62:18 (Lu explaining why Hou's assertion that Bot Auto's development is powered by revolutionary new technology is a clear falsehood).

Clearly, Appellant has shown more than just "some evidence" of a probable right to relief for Appellee's misappropriation of its trade secrets in direct violation of TUTSA. As set forth in detail above and as revealed by the record, Appellant has in fact shown multiple instances of misappropriation by decisive, direct and circumstantial, and clear and convincing evidence. Thus, the only remaining question is that of irreparable harm, and as a matter of Texas law, that issue too is due to be resolved in Appellant's favor.

**C.** **The trial court erred in denying Appellant's Application for Temporary Injunction because Appellant's evidence establishes a presumption that it suffered irreparable injury.**

A threat of probable, immediate harm is sufficiently established when a former employee is "in possession of [the former employer's] confidential information and is in a position to use it." *See Rugen*, 864 S.W.2d at 552. "When a defendant possesses trade secrets and is in a position to use them, harm to the trade secret owner *may be presumed*." *Bell Helicopter Textron, Inc.*, 160 S.W.3d at 200 (emphasis added); *T-N-T Motorsports, Inc.*, 965 S.W.2d at 24 (holding that appellant possessed confidential information and was in a position to use it; thus, appellant was likely to use information to former employer's detriment). **"The threatened disclosure of trade secrets constitutes irreparable injury as a matter of law."** *Bell Helicopter Textron, Inc.*, 160 S.W.3d at 200 (emphasis added); *Williams v. Compressor Eng'g Corp.*, 704 S.W.2d 469, 471 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (citing *FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 503 (5th Cir. 1982). Moreover, "[l]oss of goodwill or loss that is not easily calculated in pecuniary terms is sufficient to show irreparable injury for purposes of obtaining a temporary injunction." *Bell Helicopter Textron, Inc.*, 160 S.W.3d at 200; *Byrd Ranch, Inc. v. Interwest Sav. Assoc.*, 717 S.W.2d 452, 454-55 (Tex. App.—Fort Worth 1986, no writ); *Martin v. Linen Sys. for Hosp. Inc.*, 671 S.W.2d 706, 710 (Tex. App.—Houston [1st Dist.] 1984, no writ).

As explained in the sections above, Appellant has shown by overwhelming evidence that the Defendant-Appellee is not only "in possession of [the Appellant's] confidential information and is in a position to use it," but is in fact exploiting that trade secret information now. *See, e.g.,* 6RR154:12-157:6 and APP0019-APP0022 (establishing possession and use, by Bot Auto, of Appellant's Automatic Safety System Trade Secrets); *supra* at pp. 44-46 (setting forth overwhelming evidence of misappropriation of Autonomous Decision-Making Technology Trade Secrets). All of this evidence is amply sufficient, under *Bell Helicopter* and *T-N-T Motorsports*, to establish the presumption that Appellant has suffered probable, imminent, and irreparable harm from the demonstrated misappropriation.

For these reasons, the trial court erred in denying Appellant's Application for Temporary Injunction, because Appellant has shown overwhelming evidence of misappropriation of its Automatic Safety Systems and Autonomous Decision-Making Technology Trade Secrets, and thus to give rise, as a matter of Texas law, to the presumption of probable, imminent, and irreparable harm. Appellant thus respectfully submits that the Order of the Court below, denying that application, must be reversed, and the matter remanded to the trial court with instructions to enter the requested injunction prohibiting the further dissemination of that trade secret information.

## CONCLUSION

Appellant thus respectfully submits that, upon this overwhelming evidentiary record, showing as it does direct and decisive evidence of Bot Auto's misappropriation of undisputedly valuable and confidential trade secret information, and an ocean of circumstantial evidence showing that misappropriation, only one result may rightly prevail: granting Appellant's Application for Temporary and Permanent Injunction.

As set forth above, Bot Auto is developing technology products incorporating and utilizing the foregoing trade secret information, and taking them to market for investment and monetization, now. At the same time – now – Appellant continues to market its products and systems to potential customers, including prominent international manufacturers and product developers, and investors. These opportunities may imminently be lost to the predatory and wrongful competing efforts of Bot Auto.

Appellant has suffered, and will continue to suffer in the future, direct and consequential actual damages, including lost profits, damage to goodwill, loss of the benefits associated with exclusive possession of its property, and additional costs that Appellant has incurred as a result of Bot Auto's unlawful conduct. Unless Bot Auto is enjoined from further disseminating Appellant's trade secret information, Appellant will continue to be immediately and irreparably harmed.

Appellant thus respectfully requests that this Court enter its ruling and mandate, reversing the Order of the Court below denying Appellant's application for temporary injunction, and remanding the matter to the trial court with instructions to enter the requested injunction prohibiting the further dissemination of that trade secret information, and granting such other and further relief as may be deemed just and proper.

Dated:  March 3, 2025

Respectfully submitted,

By: */s/ Timothy J. McCarthy*

**Timothy J. McCarthy**
State Bar No. 24123750
tmccarthy@dykema.com
**Cliff P. Riley**
State Bar No. 24094915
criley@dykema.com
**Salvador J. Robles**
State Bar No. 24121800
srobles@dykema.com
**Aaron J. Kotulek**
State Bar No. 24137483
akotulek@dykema.com
**DYKEMA GOSSETT PLLC**
1717 Main Street, Suite 4200
Dallas, Texas 75201
Telephone: (214) 462-6400
Facsimile: (214) 462-6401

**Isaac Villarreal**
State Bar No. 24054553
ivillareal@dykema.com
**Amanda Gordon**
State Bar No. 24103737
agordon@dykema.com

**DYKEMA GOSSETT PLLC**
5 Houston Center
1401 McKinney St., Suite 1625
Houston, Texas 77010
Telephone: (713) 904-6900
Facsimile: (214) 462-6401

*Attorneys for Appellant,*
*CREATEAI HOLDINGS, INC.*

## CERTIFICATION OF COMPLIANCE

The undersigned certifies this brief complies with the type-face and length requirements of rule 9.4 of the Texas Rules of Appellate Procedure. Exclusive of the exempted portions stated in rule 9.4(i)(l), the brief contains 11,225 words, as calculated by Microsoft Word, the program used to prepare this document.

*/s/Salvador J. Robles*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record pursuant to the Texas Rules of Appellate Procedure on this 3rd day of March, 2025.

Joseph A. Fischer, III
Leisa Talbert Peschel
Tori C. Emery
JACKSON WALKER LLP
1401 McKinney, Suite 1900
Houston, TX 77010
tfisher@jw.com
lpeschel@jw.co
temery@jw.com

Richard Liu (*Pro Hac Vice)*
Innovative Legal Services, P.C.
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Richard.liu@consultils.com

*/s/ Salvador J. Robles*

4898-9101-5965.12

Case No. 15-25-00001-CV

# COURT OF APPEALS
# FOR THE
# FIFTEENTH DISTRICT OF TEXAS – AUSTIN

## CREATEAI HOLDINGS INC.,

Appellant,

v.

## BOT AUTO TX INC.,

Appellee.

## On Appeal from the 11th Judicial District of the Business Court of Harris County, Texas
## Honorable Sofia Adrogué, President Judge

## APPENDIX TO BRIEF OF APPELLANT
*Oral Argument Requested*

**Timothy J. McCarthy**
State Bar No. 24123750
tmccarthy@dykema.com
**Cliff P. Riley**
State Bar No. 24094915
criley@dykema.com
**Salvador J. Robles**
State Bar No. 24121800
srobles@dykema.com
**Aaron J. Kotulek**
State Bar No. 24137483
akotulek@dykema.com
DYKEMA GOSSETT PLLC
1717 Main Street, Suite 4200

**Isaac Villarreal**
State Bar No. 24054553
ivillareal@dykema.com
**Amanda Gordon**
State Bar No. 24103737
agordon@dykema.com
DYKEMA GOSSETT PLLC
5 Houston Center
1401 McKinney St., Suite 1625
Houston, Texas 77010
Telephone: (713) 904-6900
Facsimile: (214) 462-6401

1

Dallas, Texas 75201
Telephone: (214) 462-6400
Facsimile: (214) 462-6401

| Tab | Description | Pages: |
|---|---|---|
| 1 | TEX. CIV. PRAC. & REM. CODE § 134A.001-134A.008 | APP0001-APP0005 |
| 2 | TEX. CIV. PRAC. & REM. CODE § 65.001, 65.002, 65.011-017, 65.021-023, 65.031, 65.041-045 | APP0006-APP0013 |
| 3 | TEX. R. CIV. P. 680-692 | APP0014-APP0018 |
| 4 | Excerpts from transcript of November 19, 2024 TI hearing; Reporters Record Volume 6; TI Hearing Day 2; 154:12-157:6 (closing argument re: redundant steering and braking system) | APP0019-APP0022 |

Dated:  March 3, 2025

Respectfully submitted,

By: _/s/ Timothy J. McCarthy_

**Timothy J. McCarthy**
State Bar No. 24123750
tmccarthy@dykema.com
**Cliff P. Riley**
State Bar No. 24094915
criley@dykema.com
**Salvador J. Robles**
State Bar No. 24121800
srobles@dykema.com
**Aaron J. Kotulek**
State Bar No. 24137483
akotulek@dykema.com
**DYKEMA GOSSETT PLLC**
1717 Main Street, Suite 4200
Dallas, Texas 75201
Telephone: (214) 462-6400
Facsimile: (214) 462-6401

**Isaac Villarreal**
State Bar No. 24054553
ivillareal@dykema.com
**Amanda Gordon**
State Bar No. 24103737
agordon@dykema.com
**DYKEMA GOSSETT PLLC**
5 Houston Center
1401 McKinney St., Suite 1625
Houston, Texas 77010
Telephone: (713) 904-6900
Facsimile: (214) 462-6401

*Attorneys for Appellant,*
*CREATEAI HOLDINGS INC.*

4

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy this brief has been served on all counsel of record pursuant to the Texas Rules of Appellate Procedure on this 3rd day of March, 2025.

Joseph A. Fischer, III
Leisa Talbert Peschel
Tori C. Emergy
JACKSON WALKER LLP
1401 McKinney, Suite 1900
Houston, TX 77010
tfisher@jw.com
lpeschel@jw.co
temery@jw.com

Richard Liu (*Pro Hac Vice)*
Innovative Legal Services, P.C.
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Richard.liu@consultils.com

*/s/ Salvador J. Robles*
Salvador J. Robles

# TAB 1

CIVIL PRACTICE AND REMEDIES CODE

TITLE 6. MISCELLANEOUS PROVISIONS

CHAPTER 134A.  TRADE SECRETS

     Sec. 134A.001.  SHORT TITLE.  This chapter may be cited as the Texas Uniform Trade Secrets Act.

Added by Acts 2013, 83rd Leg., R.S., Ch. 10 (S.B. 953), Sec. 1, eff. September 1, 2013.


     Sec. 134A.002.  DEFINITIONS.  In this chapter:
          (1)  "Claimant" means a party seeking to recover damages under this chapter, including a plaintiff, counterclaimant, cross-claimant, or third-party plaintiff.  In an action in which a party seeks recovery of damages under this chapter on behalf of another person, "claimant" includes both that other person and the party seeking recovery of damages.
          (1-a)  "Clear and convincing" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.
          (2)  "Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, to limit use, or to prohibit discovery of a trade secret, or espionage through electronic or other means.
          (3)  "Misappropriation" means:
               (A)  acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
               (B)  disclosure or use of a trade secret of another without express or implied consent by a person who:
                    (i)  used improper means to acquire knowledge of the trade secret;
                    (ii)  at the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:
                         (a)  derived from or through a person who used improper means to acquire the trade secret;
                         (b)  acquired under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the trade secret; or

APP0001

(c)  derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of or limit the use of the trade secret; or

(iii)  before a material change of the position of the person, knew or had reason to know that the trade secret was a trade secret and that knowledge of the trade secret had been acquired by accident or mistake.

(3-a)  "Owner" means, with respect to a trade secret, the person or entity in whom or in which rightful, legal, or equitable title to, or the right to enforce rights in, the trade secret is reposed.

(4)  "Proper means" means discovery by independent development, reverse engineering unless prohibited, or any other means that is not improper means.

(5)  "Reverse engineering" means the process of studying, analyzing, or disassembling a product or device to discover its design, structure, construction, or source code provided that the product or device was acquired lawfully or from a person having the legal right to convey it.

(6)  "Trade secret" means all forms and types of information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedure, financial data, or list of actual or potential customers or suppliers, whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if:

(A)  the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and

(B)  the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

(7)  "Willful and malicious misappropriation" means intentional misappropriation resulting from the conscious disregard of the rights of the owner of the trade secret.

Added by Acts 2013, 83rd Leg., R.S., Ch. 10 (S.B. 953), Sec. 1, eff. September 1, 2013.
Amended by:
     Acts 2017, 85th Leg., R.S., Ch. 37 (H.B. 1995), Sec. 1, eff. September 1, 2017.

APP0002

Sec. 134A.003.  INJUNCTIVE RELIEF.  (a)  Actual or threatened misappropriation may be enjoined if the order does not prohibit a person from using general knowledge, skill, and experience that person acquired during employment.

(a-1)  On application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.

(b)  In exceptional circumstances, an injunction may condition future use upon payment of a reasonable royalty for no longer than the period of time for which use could have been prohibited.  Exceptional circumstances include a material and prejudicial change of position before acquiring knowledge or reason to know of misappropriation that renders a prohibitive injunction inequitable.

(c)  In appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order.

Added by Acts 2013, 83rd Leg., R.S., Ch. 10 (S.B. 953), Sec. 1, eff. September 1, 2013.
Amended by:
Acts 2017, 85th Leg., R.S., Ch. 37 (H.B. 1995), Sec. 2, eff. September 1, 2017.


Sec. 134A.004.  DAMAGES.  (a)  In addition to or in lieu of injunctive relief, a claimant is entitled to recover damages for misappropriation. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.  In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

(b)  If willful and malicious misappropriation is proven by clear and convincing evidence, the fact finder may award exemplary damages in an amount not exceeding twice any award made under Subsection (a).

Added by Acts 2013, 83rd Leg., R.S., Ch. 10 (S.B. 953), Sec. 1, eff. September 1, 2013.
Amended by:
Acts 2017, 85th Leg., R.S., Ch. 37 (H.B. 1995), Sec. 3, eff. September 1, 2017.

APP0003

Sec. 134A.005.  ATTORNEY'S FEES.  The court may award reasonable attorney's fees to the prevailing party if:

      (1)  a claim of misappropriation is made in bad faith;

      (2)  a motion to terminate an injunction is made or resisted in bad faith; or

      (3)  willful and malicious misappropriation exists.

Added by Acts 2013, 83rd Leg., R.S., Ch. 10 (S.B. 953), Sec. 1, eff. September 1, 2013.
Amended by:
    Acts 2017, 85th Leg., R.S., Ch. 37 (H.B. 1995), Sec. 4, eff. September 1, 2017.

Sec. 134A.006.  PRESERVATION OF SECRECY.  (a)  In an action under this chapter, a court shall preserve the secrecy of an alleged trade secret by reasonable means.  There is a presumption in favor of granting protective orders to preserve the secrecy of trade secrets.  Protective orders may include provisions limiting access to confidential information to only the attorneys and their experts, holding in camera hearings, sealing the records of the action, and ordering any person involved in the litigation not to disclose an alleged trade secret without prior court approval.

   (b)  In an action under this chapter, a presumption exists that a party is allowed to participate and assist counsel in the presentation of the party's case.  At any stage of the action, the court may exclude a party and the party's representative or limit a party's access to the alleged trade secret of another party if other countervailing interests overcome the presumption.  In making this determination, the court must conduct a balancing test that considers:

      (1)  the value of an owner's alleged trade secret;

      (2)  the degree of competitive harm an owner would suffer from the dissemination of the owner's alleged trade secret to the other party;

      (3)  whether the owner is alleging that the other party is already in possession of the alleged trade secret;

      (4)  whether a party's representative acts as a competitive decision maker;

      (5)  the degree to which a party's defense would be impaired by limiting that party's access to the alleged trade secret;

      (6)  whether a party or a party's representative possesses specialized expertise that would not be available to a party's outside

APP0004

expert; and

   (7) the stage of the action.

Added by Acts 2013, 83rd Leg., R.S., Ch. 10 (S.B. 953), Sec. 1, eff. September 1, 2013.
Amended by:
  Acts 2017, 85th Leg., R.S., Ch. 37 (H.B. 1995), Sec. 5, eff. September 1, 2017.


  Sec. 134A.007. EFFECT ON OTHER LAW. (a) Except as provided by Subsection (b), this chapter displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret.
  (b) This chapter does not affect:
   (1) contractual remedies, whether or not based upon misappropriation of a trade secret;
   (2) other civil remedies that are not based upon misappropriation of a trade secret; or
   (3) criminal remedies, whether or not based upon misappropriation of a trade secret.
  (c) To the extent that this chapter conflicts with the Texas Rules of Civil Procedure, this chapter controls. Notwithstanding Section 22.004, Government Code, the supreme court may not amend or adopt rules in conflict with this chapter.
  (d) This chapter does not affect the disclosure of public information by a governmental body under Chapter 552, Government Code.

Added by Acts 2013, 83rd Leg., R.S., Ch. 10 (S.B. 953), Sec. 1, eff. September 1, 2013.


  Sec. 134A.008. UNIFORMITY OF APPLICATION AND CONSTRUCTION. This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it.

Added by Acts 2013, 83rd Leg., R.S., Ch. 10 (S.B. 953), Sec. 1, eff. September 1, 2013.

APP0005

# TAB 2

CIVIL PRACTICE AND REMEDIES CODE

TITLE 3. EXTRAORDINARY REMEDIES

CHAPTER 65. INJUNCTION

SUBCHAPTER A. GENERAL PROVISIONS

Sec. 65.001.  APPLICATION OF EQUITY PRINCIPLES.  The principles governing courts of equity govern injunction proceedings if not in conflict with this chapter or other law.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.


Sec. 65.002.  RESTRAINING ORDER OR INJUNCTION AFFECTING CUSTOMER OF FINANCIAL INSTITUTION.  Service or delivery of a restraining order or injunction affecting property held by a financial institution in the name of or on behalf of a customer of the financial institution is governed by Section 59.008, Finance Code.

Added by Acts 1999, 76th Leg., ch. 344, Sec. 7.006, eff. Sept. 1, 1999.


SUBCHAPTER B. AVAILABILITY OF REMEDY

Sec. 65.011.  GROUNDS GENERALLY.  A writ of injunction may be granted if:

(1)  the applicant is entitled to the relief demanded and all or part of the relief requires the restraint of some act prejudicial to the applicant;

(2)  a party performs or is about to perform or is procuring or allowing the performance of an act relating to the subject of pending litigation, in violation of the rights of the applicant, and the act would tend to render the judgment in that litigation ineffectual;

(3)  the applicant is entitled to a writ of injunction under the principles of equity and the statutes of this state relating to injunctions;

(4)  a cloud would be placed on the title of real property being sold under an execution against a party having no interest in the real property subject to execution at the time of sale, irrespective of any remedy at law;  or

APP0006

(5)  irreparable injury to real or personal property is threatened, irrespective of any remedy at law.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.  Amended by Acts 1987, 70th Leg., ch. 167, Sec. 3.17, eff. Sept. 1, 1987.


Sec. 65.012.  OPERATION OF WELL OR MINE.  (a)  A court may issue an injunction or temporary restraining order prohibiting subsurface drilling or mining operations only if an adjacent landowner filing an application claims that a wrongful act caused injury to his surface or improvements or loss of or injury to his minerals and if the party against whom the injunction is sought is unable to respond in damages for the resulting injuries.

(b)  To secure the payment of any injuries that may be sustained by the complainant as a result of subsurface drilling or mining operations, the party against whom an injunction is sought under this section shall enter into a good and sufficient bond in an amount fixed by the court hearing the application.

(c)  The court may appoint a trustee or receiver instead of requiring a bond if the court considers it necessary to protect the interests involved in litigation concerning an injunction under this section.  The trustee or receiver has the powers prescribed by the court and shall take charge of and hold the minerals produced from the drilling or mining operation or the proceeds from the disposition of those minerals, subject to the final disposition of the litigation.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.


Sec. 65.013.  STAY OF JUDGMENT OR PROCEEDING.  An injunction may not be granted to stay a judgment or proceeding at law except to stay as much of the recovery or cause of action as the complainant in his petition shows himself equitably entitled to be relieved against and as much as will cover the costs.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.


Sec. 65.014.  LIMITATIONS ON STAY OF EXECUTION OF JUDGMENT.  (a) Except as provided by Subsection (b), an injunction to stay execution of a valid judgment may not be granted more than one year after the date on which the judgment was rendered unless:

APP0007

(1)  the application for the injunction has been delayed because of fraud or false promises of the plaintiff in the judgment practiced or made at the time of or after rendition of the judgment;  or

(2)  an equitable matter or defense arises after the rendition of the judgment.

(b)  If the applicant for an injunction to stay execution of a judgment was absent from the state when the judgment was rendered and was unable to apply for the writ within one year after the date of rendition, the injunction may be granted at any time within two years after that date.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.


Sec. 65.015.  CLOSING OF STREETS.  An injunction may not be granted to stay or prevent the governing body of an incorporated city from vacating, abandoning, or closing a street or alley except on the suit of a person:

(1)  who is the owner or lessee of real property abutting the part of the street or alley vacated, abandoned, or closed;  and

(2)  whose damages have neither been ascertained and paid in a condemnation suit by the city nor released.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.


Sec. 65.016.  VIOLATION OF REVENUE LAW.  At the instance of the county or district attorney or the attorney general, a court by injunction may prevent, prohibit, or restrain the violation of any revenue law of this state.

Added by Acts 1989, 71st Leg., ch. 2, Sec. 4.03(a), eff. Aug. 28, 1989.


Sec. 65.017.  CIGARETTE SELLER, DISTRIBUTOR, OR MANUFACTURER.  In addition to any other remedy provided by law, a person may bring an action in good faith for appropriate injunctive relief if the person sells, distributes, or manufactures cigarettes and sustains a direct economic or commercial injury as a result of a violation of:

(1)  Section 48.015, Penal Code; or

(2)  Section 154.0415, Tax Code.

Added by Acts 2007, 80th Leg., R.S., Ch. 885 (H.B. 2278), Sec. 2.12, eff. April 1, 2009.


SUBCHAPTER C. JURISDICTION OF PROCEEDINGS;  VENUE

APP0008

Sec. 65.021.  JURISDICTION OF PROCEEDING.  (a)  The judge of a district or county court in term or vacation shall hear and determine applications for writs of injunction.

(b)  This section does not limit injunction jurisdiction granted by law to other courts.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.


Sec. 65.022.  RETURN OF WRIT;  HEARING BY NONRESIDENT JUDGE.  (a) Except as provided by this section, a writ of injunction is returnable only to the court granting the writ.

(b)  A district judge may grant a writ returnable to a court other than his own if the resident judge refuses to act or cannot hear and act on the application because of his absence, sickness, inability, inaccessibility, or disqualification.  Those facts must be fully set out in the application or in an affidavit accompanying the application.  A judge who refuses to act shall note that refusal and the reasons for refusal on the writ.  A district judge may not grant the writ if the application has been acted on by another district judge.

(c)  A district judge may grant a writ returnable to a court other than his own to stay execution or restrain foreclosure, sale under a deed of trust, trespass, removal of property, or an act injurious to or impairing riparian or easement rights if satisfactory proof is made to the nonresident judge that it is impracticable for the applicant to reach the resident judge and procure the action of the resident judge in time to put into effect the purposes of the application.

(d)  A district judge may grant a writ returnable to a court other than his own if the resident judge cannot be reached by the ordinary and available means of travel and communication in sufficient time to put into effect the purpose of the writ sought.  In seeking a writ under this subsection, the applicant or attorney for the applicant shall attach to the application an affidavit that fully states the facts of the inaccessibility and the efforts made to reach and communicate with the resident judge.  The judge to whom application is made shall refuse to hear the application unless he determines that the applicant made fair and reasonable efforts to reach and communicate with the resident judge.  The injunction may be dissolved on a showing that the applicant did not first make reasonable efforts to procure a hearing on the application before the resident judge.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.

APP0009

Sec. 65.023.  PLACE FOR TRIAL.  (a)  Except as provided by Subsection (b), a writ of injunction against a party who is a resident of this state shall be tried in a district or county court in the county in which the party is domiciled.  If the writ is granted against more than one party, it may be tried in the proper court of the county in which either party is domiciled.

(b)  A writ of injunction granted to stay proceedings in a suit or execution on a judgment must be tried in the court in which the suit is pending or the judgment was rendered.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.


SUBCHAPTER D. INJUNCTION OBTAINED FOR PURPOSES OF DELAYING COLLECTION OF MONEY

Sec. 65.031.  DISSOLUTION;  AWARD OF DAMAGES.  If on final hearing a court dissolves in whole or in part an injunction enjoining the collection of money and the injunction was obtained only for delay, the court may assess damages in an amount equal to 10 percent of the amount released by dissolution of the injunction, exclusive of costs.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.


SUBCHAPTER E. APPLICANTS BOND FOR TEMPORARY RESTRAINING ORDER OR TEMPORARY INJUNCTION

Sec. 65.041.  BOND NOT REQUIRED FOR ISSUANCE OF TEMPORARY RESTRAINING ORDER FOR CERTAIN INDIGENT APPLICANTS.  A court may not require an applicant for a temporary restraining order to execute a bond to the adverse party before the order may issue if:

(1)  the applicant submits an affidavit that meets the requirements of Section 65.043 to the court;  and

(2)  the court finds that the order is intended to restrain the adverse party from foreclosing on the applicant's residential homestead.

Added by Acts 1989, 71st Leg., ch. 391, Sec. 1, eff. Aug. 28, 1989.


Sec. 65.042.  BOND NOT REQUIRED FOR ISSUANCE OF TEMPORARY INJUNCTION FOR CERTAIN INDIGENT APPLICANTS.  (a)  A court may not require an applicant

APP0010

for a temporary injunction to execute a bond to the adverse party before the injunction may issue if:

(1)  the applicant submits an affidavit that meets the requirements of Section 65.043 to the court;  and

(2)  the court finds that the injunction is intended to enjoin the adverse party from foreclosing on the applicant's residential homestead.

(b)  If the affidavit submitted under Subsection (a)(1) is contested under Section 65.044, the court may not issue a temporary injunction unless the court finds that the applicant is financially unable to execute the bond.

Added by Acts 1989, 71st Leg., ch. 391, Sec. 1, eff. Aug. 28, 1989.


Sec. 65.043.  AFFIDAVIT.  (a)  The affidavit must contain complete information relating to each and every person liable for the indebtedness secured by or with an ownership interest in the residential homestead concerning the following matters:

(1)  identity;

(2)  income, including income from employment, dividends, interest, and any other source other than from a government entitlement;

(3)  spouse's income, if known to the applicant;

(4)  description and estimated value of real and personal property, other than the applicant's homestead;

(5)  cash and checking account;

(6)  debts and monthly expenses;

(7)  dependents;  and

(8)  any transfer to any person of money or other property with a value in excess of $1,000 made within one year of the affidavit without fair consideration.

(b)  The affidavit must state: "I am not financially able to post a bond to cover any judgment against me in this case.  All financial information that I provided to the lender was true and complete and contained no false statements or material omissions at the time it was provided to the lender.  Upon oath and under penalty of perjury, the statements made in this affidavit are true."

(c)  In the event the applicant is married, both spouses must execute the affidavit.

(d)  The affidavit must be verified.

Added by Acts 1989, 71st Leg., ch. 391, Sec. 1, eff. Aug. 28, 1989.

APP0011

Sec. 65.044.  CONTEST OF AFFIDAVIT.  (a)  A party may not contest an affidavit filed by an applicant for a temporary restraining order as provided by Section 65.041.

(b)  A party may contest an affidavit filed by an applicant for a temporary injunction as provided by Section 65.042:

(1)  after service of a temporary restraining order in the case; or

(2)  if a temporary restraining order was not applied for or issued, after service of notice of the hearing on the application for the temporary injunction.

(c)  A party contests an affidavit by filing a written motion and giving notice to all parties of the motion in accordance with Rule 21a of the Texas Rules of Civil Procedure.

(d)  The court shall hear the contest at the hearing on the application for a temporary injunction and determine whether the applicant is financially able to execute a bond against the adverse party as required by the Texas Rules of Civil Procedure.  In making its determination, the court may not consider:

(1)  any income from a government entitlement that the applicant receives;  or

(2)  the value of the applicant's residential homestead.

(e)  The court may order the applicant to post and file with the clerk a bond as required by the Texas Rules of Civil Procedure only if the court determines that the applicant is financially able to execute the bond.

(f)  An attorney who represents an applicant and who provides legal services without charge to the applicant and without a contractual agreement for payment contingent on any event may file an affidavit with the court describing the financial nature of the representation.

Added by Acts 1989, 71st Leg., ch. 391, Sec. 1, eff. Aug. 28, 1989.


Sec. 65.045.  CONFLICT WITH TEXAS RULES OF CIVIL PROCEDURE.  (a)  To the extent that this subchapter conflicts with the Texas Rules of Civil Procedure, this subchapter controls.

(b)  Notwithstanding Section 22.004, Government Code, the supreme court may not amend or adopt rules in conflict with this subchapter.

(c)  The district courts and statutory county courts in a county may not adopt local rules in conflict with this subchapter.

Added by Acts 1989, 71st Leg., ch. 391, Sec. 1, eff. Aug. 28, 1989.

APP0012

APP0013

# TAB 3

(b)    the receiver or officer must not sell the judgment debtor's personal property or distribute its proceeds to the judgment creditor until the court determines the judgment debtor's exemption claim.

(2)    *Hearing Notice.*   Each party is entitled to reasonable notice of the hearing.

(3)    *Burden of Proof.*   At the hearing, the judgment debtor must prove the exemption claim and the value of the personal property exempt.   The judgment debtor may satisfy this burden through a sworn statement if the sworn statement is not challenged. A "sworn" statement is one that is signed before a notary or made under penalty of perjury. A signed Protected Property Claim Form is a "sworn" statement.

(4)    *Time for Determining Exemption Claim.* The court must determine the judgment debtor's exemption claim within 10 days after the judgment debtor files the exemption claim. The court may extend the time for determining the exemption claim on good cause shown.

(5)    *Release of Property.* If the court determines that the judgment debtor's personal property is exempt, the court must order its release within three business days.

**Notes and Comments**

2022 Comment: Rule 679b is a new rule implementing section 22.0042 of the Texas Government Code, which calls for expedited procedures that allow a judgment debtor to assert an exemption to the seizure of personal property by a judgment creditor or receiver appointed under section 31.002 of the Civil Practice and Remedies Code. Rule 306a, various rules in Part V, Rule 663a, and Rule 664a are also amended to implement section 22.0042 of the Texas Government Code.

S<small>ECTION</small> 5.  I<small>NJUNCTIONS</small>

**RULE 680.  TEMPORARY RESTRAINING ORDER**

No temporary restraining order shall be granted without notice to the adverse party unless it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before notice can be served and a hearing had thereon. Every temporary restraining order granted without notice shall be endorsed with the date and hour of issuance; shall be filed forthwith in the clerk's office and entered of record; shall define the injury and state why it is irreparable and why the order was granted without notice; and shall expire by its terms within such time after signing, not to exceed fourteen days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period or unless the party against whom the order is directed consents that it may be extended for a longer period. The reasons for the extension shall be entered of record. No more than one extension may be granted unless subsequent extensions are unopposed. In case a temporary restraining order is granted without notice, the application for a temporary injunction shall be set

APP0014

down for hearing at the earliest possible date and takes precedence of all matters except older matters of the same character; and when the application comes on for hearing the party who obtained the temporary restraining order shall proceed with the application for a temporary injunction and, if he does not do so, the court shall dissolve the temporary restraining order. On two days' notice to the party who obtained the temporary restraining order without notice or on such shorter notice to that party as the court may prescribe, the adverse party may appear and move its dissolution or modification and in that event the court shall proceed to hear and determine such motion as expeditiously as the ends of justice require.

Every restraining order shall include an order setting a certain date for hearing on the temporary or permanent injunction sought.

## RULE 681.  TEMPORARY INJUNCTIONS: NOTICE

No temporary injunction shall be issued without notice to the adverse party.

## RULE 682.  SWORN PETITION

No writ of injunction shall be granted unless the applicant therefor shall present his petition to the judge verified by his affidavit and containing a plain and intelligible statement of the grounds for such relief.

## RULE 683.  FORM AND SCOPE OF INJUNCTION OR RESTRAINING ORDER

Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

Every order granting a temporary injunction shall include an order setting the cause for trial on the merits with respect to the ultimate relief sought. The appeal of a temporary injunction shall constitute no cause for delay of the trial.

## RULE 684.  APPLICANT'S BOND

In the order granting any temporary restraining order or temporary injunction, the court shall fix the amount of security to be given by the applicant. Before the issuance of the temporary restraining order or temporary injunction the applicant shall execute and file with the clerk a bond to the adverse party, with two or more good and sufficient sureties, to be approved by the clerk, in the sum fixed by the judge, conditioned that the applicant will abide the decision which may be

APP0015

made in the cause, and that he will pay all sums of money and costs that may be adjudged against him if the restraining order or temporary injunction shall be dissolved in whole or in part.

Where the temporary restraining order or temporary injunction is against the State, a municipality, a State agency, or a subdivision of the State in its governmental capacity, and is such that the State, municipality, State agency, or subdivision of the State in its governmental capacity, has no pecuniary interest in the suit and no monetary damages can be shown, the bond shall be allowed in the sum fixed by the judge, and the liability of the applicant shall be for its face amount if the restraining order or temporary injunction shall be dissolved in whole or in part. The discretion of the trial court in fixing the amount of the bond shall be subject to review. Provided that under equitable circumstances and for good cause shown by affidavit or otherwise the court rendering judgment on the bond may allow recovery for less than its full face amount, the action of the court to be subject to review.

## RULE 685.   FILING AND DOCKETING

Upon the grant of a temporary restraining order or an order fixing a time for hearing upon an application for a temporary injunction, the party to whom the same is granted shall file his petition therefor, together with the order of the judge, with the clerk of the proper court; and, if such orders do not pertain to a pending suit in said court, the cause shall be entered on the docket of the court in its regular order in the name of the party applying for the writ as plaintiff and of the opposite party as defendant.

## RULE 686.   CITATION

Upon the filing of such petition and order not pertaining to a suit pending in the court, the clerk of such court shall issue a citation to the defendant as in other civil cases, which shall be served and returned in like manner as ordinary citations issued from said court; provided, however, that when a temporary restraining order is issued and is accompanied with a true copy of plaintiff's petition, it shall not be necessary for the citation in the original suit to be accompanied with a copy of plaintiff's petition, nor contain a statement of the nature of plaintiff's demand, but it shall be sufficient for said citation to refer to plaintiff's claim as set forth in a true copy of plaintiff's petition which accompanies the temporary restraining order; and provided further that the court may have a hearing upon an application for a temporary restraining order or temporary injunction at such time and upon such reasonable notice given in such manner as the court may direct.

## RULE 687.   REQUISITES OF WRIT

The writ of injunction shall be sufficient if it contains substantially the following requisites:

(a)      Its style shall be, "The State of Texas."

(b)      It shall be directed to the person or persons enjoined.

Page 297

APP0016

(c)     It must state the names of the parties to the proceedings, plaintiff and defendant, and the nature of the plaintiff's application, with the action of the judge thereon.

(d)     It must command the person or persons to whom it is directed to desist and refrain from the commission or continuance of the act enjoined, or to obey and execute such order as the judge has seen proper to make.

(e)     If it is a temporary restraining order, it shall state the day and time set for hearing, which shall not exceed fourteen days from the date of the court's order granting such temporary restraining order; but if it is a temporary injunction, issued after notice, it shall be made returnable at or before ten o'clock a.m. of the Monday next after the expiration of twenty days from the date of service thereof, as in the case of ordinary citations.

(f)     It shall be dated and signed by the clerk officially and attested with the seal of his office and the date of its issuance must be indorsed thereon.

## RULE 688.   CLERK TO ISSUE WRIT

When the petition, order of the judge and bond have been filed, the clerk shall issue the temporary restraining order or temporary injunction, as the case may be, in conformity with the terms of the order, and deliver the same to the sheriff or any constable of the county of the residence of the person enjoined, or to the applicant, as the latter shall direct. If several persons are enjoined, residing in different counties, the clerk shall issue such additional copies of the writ as shall be requested by the applicant.   The clerk must retain a copy of the temporary restraining order or temporary injunction in the court's file.

## RULE 689.   SERVICE AND RETURN

The officer receiving a writ of injunction shall indorse thereon the date of its receipt by him, and shall forthwith execute the same by delivering to the party enjoined a true copy thereof.   The officer must complete and file a return in accordance with Rule 107.

## RULE 690.   THE ANSWER

The defendant to an injunction proceeding may answer as in other civil actions; but no injunction shall be dissolved before final hearing because of the denial of the material allegations of the plaintiff's petition, unless the answer denying the same is verified by the oath of the defendant.

## RULE 691.   BOND ON DISSOLUTION

Page 298

Upon the dissolution of an injunction restraining the collection of money, by an interlocutory order of the court or judge, made in term time or vacation, if the petition be continued over for trial, the court or judge shall require of the defendant in such injunction proceedings a bond, with two or more good and sufficient sureties, to be approved by the clerk of the court, payable to the complainant in double the amount of the sum enjoined, and conditioned to refund to the complainant the amount of money, interest and costs which may be collected of him in the suit or proceeding enjoined if such injunction is made perpetual on final hearing. If such injunction is so perpetuated, the court, on motion of the complainant, may enter judgment against the principal and sureties in such bond for such amount as may be shown to have been collected from such defendant.

## RULE 692. DISOBEDIENCE

Disobedience of an injunction may be punished by the court or judge, in term time or in vacation, as a contempt. In case of such disobedience, the complainant, his agent or attorney, may file in the court in which such injunction is pending or with the judge in vacation, his affidavit stating what person is guilty of such disobedience and describing the acts constituting the same; and thereupon the court or judge shall cause to be issued an attachment for such person, directed to the sheriff or any constable of any county, and requiring such officer to arrest the person therein named if found within his county and have him before the court or judge at the time and place named in such writ; or said court or judge may issue a show cause order, directing and requiring such person to appear on such date as may be designated and show cause why he should not be adjudged in contempt of court. On return of such attachment or show cause order, the judge shall proceed to hear proof; and if satisfied that such person has disobeyed the injunction, either directly or indirectly, may commit such person to jail without bail until he purges himself of such contempt, in such manner and form as the court or judge may direct.

## RULE 693. PRINCIPLES OF EQUITY APPLICABLE

The principles, practice and procedure governing courts of equity shall govern proceedings in injunctions when the same are not in conflict with these rules or the provisions of the statutes.

## RULE 693a. BOND IN DIVORCE CASE

In a divorce case the court in its discretion may dispense with the necessity of a bond in connection with an ancillary injunction in behalf of one spouse against the other.

## SECTION 6. MANDAMUS

## RULE 694. NO MANDAMUS WITHOUT NOTICE

APP0018

# TAB 4

And the Court will recall that Mr. Lu testified that the effort to develop the semantics reflected at page 08, extremely labor intensive, extremely capital intensive. We submit highly unlikely to have been replicated by Bot Auto without having had access to that trade secret information from TuSimple. And in that regard, we note that Dr. Hou and Lei Wang, the central figures in both the laptop investigation and the solicitation investigation and in this case, are now both at Bot Auto.

And then, finally, Your Honor, with regard to the redundant safety systems, we'll refer to the Court to Exhibit 136. The Court will recall that this is the TuSimple system requirements document for its proprietary redundant steering system and, in fact, its MVP program, that is to say it's latest generation redundant steering system.

The Court will recall that beginning at page 11 of this document, there are a series of system requirements, parameters that Mr. Lu described as powerful indicators of copying, of duplication of the design and architecture of the redundant steering system, if those same metrics and parameters were to appear within the requirements of some other

autonomous trucking company.

In that regard, Your Honor, we refer the Court now to Exhibit 132. 1-3-2.

And in particular, we refer the Court to pages 003 and 004 of this document, where the same requirements parameters appear: Torque, Steering Wheel Position Accuracy, Command latency.

We refer the Court next to very next page of that same exhibit. The Court will note that similar parameters, Command latency, Accuracy, appear with regard to the braking system. But with regard to the alleged misappropriation of the design and architecture information pertaining to TuSimple's redundant braking system, we referral the Court, respectfully, to Exhibit 57. That is 5-7. And in particular to page 51, 0-5-1, of that exhibit.

The Court may recall that Mr. Lu testified in the upper left-hand portion of this diagram, between the blue rectangles and the next yellow rectangles over on the right there, is a reference to mCAN, main CAN bus, and rCAN, redundant CAN bus.

And Mr. Lu testified that that design and that architecture, relying on dual CAN buses, those forms of electrical control units, to achieve redundancy within the system is a TuSimple

proprietary, trade secret design and architecture, such that if that information were to appear in another party's business, that would indicate misappropriation of that design and architecture.

We refer the Court also specifically in this regard to Exhibit 135. And to section 7.2 of this document, which appears at page 053 -- so exhibit number -- I'm sorry -- it's exhibit page stamped 135-053.

This, again, is the TuSimple brake system requirements document. Which, again, specifies that the brake system shall support the dual physical communication channels of CAN1 and CAN2. So, again, dual CAN buses achieve redundancy in the system.

And in this regard, Your Honor, we refer the Court finally to Exhibit 133. And in particular, to page 133-011. This document, which Mr. Hou authenticated during his direct testimony, is the braking solution design document of Bot Auto. At page 011, the Court will see a schematic for the design and architecture of a redundant braking system. And the Court will see, again, in the upper left-hand portion of the document, braking central ECU, compute unit and CAN1 and CAN2. Again, relying on dual CAN buses to achieve redundancy in the system.

Once again, Your Honor, with regard to the braking system, and as before with regard to the steering system, direct specific evidence that TuSimple's trade secret design and architecture information for these systems resides within the possession of Bot Auto.

We'll now turn briefly to the law. There has been some discussion, Your Honor, of a proposition that there is no log of source code having been taken out.

All right. So, look, Your Honor, we've briefed the law to the Court. There are several points where there is some dueling credibility at issue. We would submit the Court has had multiple opportunities to test these two apex witnesses' credibility. We would refer the Court in particular to one statement from Mr. Hou, that he believes that candor is a very subjective matter. We believe that it is not.

We believe that the evidence that has been presented to the Court demonstrates, well beyond the standard that applies to the plaintiff here at this hearing and demonstrates that TuSimple's trade secret, not in one instance, not in two instances, but in three, four instances has now been directly shown to

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kathy Lowery on behalf of Timothy McCarthy
Bar No. 24123750
KLowery@dykema.com
Envelope ID: 98017016
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief of Appellant
Status as of 3/4/2025 7:20 AM CST

Associated Case Party: Bot Auto TX Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Nicole Burkholder | | nburkholder@jw.com | 3/3/2025 10:43:19 PM | SENT |
| Leisa Peschel | 24060414 | lpeschel@jw.com | 3/3/2025 10:43:19 PM | SENT |
| Leisa Peschel | 24060414 | lpeschel@jw.com | 3/3/2025 10:43:19 PM | SENT |
| Alli Allman | | aallman@jw.com | 3/3/2025 10:43:19 PM | SENT |
| Victoria Emery | 24126228 | temery@jw.com | 3/3/2025 10:43:19 PM | SENT |
| Joseph AFischer, III | | tfischer@jw.com | 3/3/2025 10:43:19 PM | SENT |
| Victoria Emery | 24126228 | temery@jw.com | 3/3/2025 10:43:19 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Joseph Fischer | 789292 | tfischer@jw.com | 3/3/2025 10:43:19 PM | SENT |
| Juana Sauceda | | jsauceda@jw.com | 3/3/2025 10:43:19 PM | SENT |
| Richard Liu | | richard.liu@consultils.com | 3/3/2025 10:43:19 PM | SENT |

Associated Case Party: TuSimple Holdings, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Cliff PRiley | | criley@dykema.com | 3/3/2025 10:43:19 PM | SENT |
| Cliff PRiley | | criley@dykema.com | 3/3/2025 10:43:19 PM | SENT |
| Christopher Kratovil | | ckratovil@dykema.com | 3/3/2025 10:43:19 PM | SENT |
| Christopher Kratovil | | ckratovil@dykema.com | 3/3/2025 10:43:19 PM | SENT |
| Isaac Villarreal | | ivillarreal@dykema.com | 3/3/2025 10:43:19 PM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kathy Lowery on behalf of Timothy McCarthy
Bar No. 24123750
KLowery@dykema.com
Envelope ID: 98017016
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief of Appellant
Status as of 3/4/2025 7:20 AM CST

Associated Case Party: TuSimple Holdings, Inc.

| | | | | |
|---|---|---|---|---|
| Isaac Villarreal | | ivillarreal@dykema.com | 3/3/2025 10:43:19 PM | SENT |
| Kathy Lowery | | klowery@dykema.com | 3/3/2025 10:43:19 PM | SENT |
| Jennifer Schmitt | | jschmitt@dykema.com | 3/3/2025 10:43:19 PM | SENT |
| Sebastian Campos | | scampos@dykema.com | 3/3/2025 10:43:19 PM | SENT |
| Amanda Gordon | | agordon@dykema.com | 3/3/2025 10:43:19 PM | SENT |
| Lina Null | | lnull@dykema.com | 3/3/2025 10:43:19 PM | SENT |
| Lina Null | | lnull@dykema.com | 3/3/2025 10:43:19 PM | SENT |
| Amanda Gordon | | agordon@dykema.com | 3/3/2025 10:43:19 PM | SENT |
| Salvador Robles | | SRobles@dykema.com | 3/3/2025 10:43:19 PM | SENT |
| Jennifer Schmitt | | jschmitt@dykema.com | 3/3/2025 10:43:19 PM | SENT |
| Timothy J.McCarthy | | TMcCarthy@dykema.com | 3/3/2025 10:43:19 PM | SENT |
| Kathy Lowery | | klowery@dykema.com | 3/3/2025 10:43:19 PM | SENT |
| Isaac Villarreal | | ivillarreal@dykema.com | 3/3/2025 10:43:19 PM | SENT |
| Aaron Kotulek | | akotulek@dykema.com | 3/3/2025 10:43:19 PM | SENT |